## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>1401 H Street, NW, Suite 3000<br>Washington, DC 20530<br><br>                    Plaintiff,<br><br>           v.<br><br>AMSTED INDUSTRIES, INC.,<br>Two Prudential Plaza<br>180 North Stetson Street, Suite 1800<br>Chicago, IL 60601<br>                    Defendant. | CASE NO.<br><br> JUDGE:<br><br>DECK TYPE: Antitrust<br><br>DATE STAMP: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable and other relief against defendant Amsted Industries, Inc. ("Amsted") to remedy the harm to competition caused by Amsted's acquisition of FM Industries ("FMI"). The United States alleges as follows:

I.

## NATURE OF ACTION

1.     Prior to Amsted's acquisition of FMI on December 1, 2005, the two firms vigorously competed with each other to sell new and reconditioned end-of-car cushioning units ("EOCCs") to railroads throughout the United States.

2.      Amsted's acquisition of FMI has reduced the number of new EOCC suppliers from two to one, resulting in a merger to monopoly. The transaction also has reduced the number of reconditioned EOCC suppliers from three to two. Amsted's acquisition of FMI consolidated 90 percent of all EOCC sales in the United States.

3.      The transaction has substantially lessened competition in the design, manufacture, and sale of new and reconditioned EOCCs and has created a monopoly in the design, manufacture, and sale of new EOCCs. As a result, prices for new and reconditioned EOCCs have increased and likely will continue to increase, the quality of EOCCs likely will decline, innovation relating to EOCCs likely will decline, and services currently offered in the EOCC markets have become and will continue to be less favorable to railroad customers. The United States, through this suit, asks the court to declare the defendant's conduct illegal and to restore the benefits of competition that were lost as a result of the transaction.

II.

JURISDICTION AND VENUE

4.      The United States brings this action against defendant Amsted under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain Amsted from continuing to violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

5.      Defendant designs, manufactures, and sells new and reconditioned EOCCs in the flow of interstate commerce. Defendant's activities in designing, manufacturing, and selling EOCCs substantially affect interstate commerce. This Court has subject matter jurisdiction over

2

this action and over the defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(c). Defendant has consented to venue and personal jurisdiction in this judicial district.

III.

PARTIES TO THE TRANSACTION

7.     Amsted is a Delaware corporation with its principal place of business in Chicago, Illinois. Amsted's EOCC sales in the United States are made through its wholly owned subsidiary, ASF-Keystone. ASF-Keystone is a Delaware corporation with its principal place of business in Granite City, IL. Amsted is a diversified manufacturer of industrial components for the railroad, vehicular, and construction markets. Amsted's products include a range of railroad car parts, including couplers, side frames, bolsters, draft gears, and EOCCs. In 2005, Amsted had approximately $2.5 billion in sales. Amsted's EOCC manufacturing facility is located in Camp Hill, PA. Amsted's new and reconditioned EOCCs are shipped to customers throughout the United States and account for approximately $22 million in sales.

8.     Progress Rail Services Holding Corporation ("Progress Rail") is a Delaware corporation with its principal place of business in Albertville, AL and is a wholly owned subsidiary of Caterpillar, Inc., a Delaware corporation. Progress Rail is one of the largest suppliers of new and reconditioned railroad car parts, rail and trackwork components, and railroad car repair services to the railroad industry in the United States. Progress Rail has

manufacturing facilities in 23 states, Canada, and Mexico. In 2005, Progress Rail had approximately $1.2 billion in sales.

9.      Progress Rail's EOCC sales in the United States were made through its wholly owned subsidiary, FMI, formerly a Texas corporation with its principal place of business and EOCC manufacturing facility in Fort Worth, TX. FMI shipped new and reconditioned EOCCs to customers throughout the United States. In 2005, FMI had sales of approximately $24 million.

IV.

THE TRANSACTION

10.     On December 1, 2005, Amsted and Progress Rail completed an asset swap by which Progress Rail conveyed to Amsted its wholly owned subsidiary, FMI. On April 25, 2006, Amsted dismantled FMI by firing its employees and disposing of virtually all FMI plant equipment through an auction.

V.

TRADE AND COMMERCE

A.    The Relevant Product Markets

11.     All freight cars undergo considerable stress from "longitudinal" forces, or forces exerted along the length of the train. During transit, freight cars are subjected to alternating longitudinal forces called draft and buff forces. Draft forces are pulling forces caused by train acceleration when freight cars are stretched or pulled apart. Buff forces are compressive forces caused by train deceleration when freight cars are pushed together. Freight cars also undergo considerable stress during switching and coupling at train depots. In order for a railroad to

4

connect one freight car to another, it must collide the cars at significant speed. The impacts sustained during switching and coupling, like draft and buff forces, can cause serious damage to sensitive cargo inside a freight car.

12. All freight cars are equipped with some type of energy absorption device to mitigate the effects of draft, buff, and coupling stresses. The most common device is a draft gear, which provides the minimum protection required for safe railroad operation. Draft gears rely on friction between two steel plates to absorb and dissipate the energy created by longitudinal forces impacting the freight car. Another type of device is commonly referred to as an "elastomeric device." Elastomeric devices are lightweight and low cost, but they are not suitable for all applications as they return much of the absorbed energy back into the draft system.

13. Railroads must use EOCCs, a specialized energy absorption device, when transporting sensitive cargos on freight cars. These shock absorbing devices use hydraulics (e.g., pressurized nitrogen gas and oils) to minimize longitudinal forces by absorbing and dissipating the maximum buff, draft, and coupling forces experienced during transit. By reducing and absorbing the forces exerted on freight cars, EOCCs ensure that sensitive cargo is not damaged during transit. Each EOCC unit consists of a piston, shaft, cylinder, end bells, and a rod that attaches the piston to the freight car coupler. Each EOCC-equipped freight car requires two EOCCs, one at each end of the freight car.

14. Other energy absorption devices, such as draft gears and elastomeric devices, do not provide the necessary level of cushioning required by customers shipping sensitive goods on

5

freight cars. EOCCs therefore are critical components for freight cars carrying sensitive commodities, such as steel coils, automobile products, electronics, lumber, and paper products. Railroads and new freight car builders do not consider the price or availability of draft gears or elastomeric devices when soliciting prices for EOCCs from prospective suppliers.

15.    Though sensitive cargos can be transported by "intermodal" freight cars with articulated connectors, railroads cannot substitute intermodal transportation for freight cars equipped with EOCCs. Intermodal freight cars are specially designed railcars that allow standard cargo containers to be stacked for rail transport. The cars must travel in groups connected by a "slackless" articulated coupling system. The coupling system transfers longitudinal forces to the ends of the intermodal group, protecting the containers from damage. Intermodal freight cars with articulated connectors do not provide sufficient cushioning for sensitive commodities, cannot physically transport certain sensitive commodities (such as automobiles and certain lumber products), and are subject to additional costs and operational constraints. When soliciting prices for EOCCs from prospective suppliers, railroad customers do not consider the cost or availability of transporting goods using intermodal freight cars.

16.    Accordingly, railroad customers can use only freight cars equipped with EOCCs to carry certain sensitive goods and cannot substitute draft gears, elastomeric devices, or intermodal transport for EOCCs on freight cars.

17.    Railroad customers use either new or reconditioned EOCCs when equipping freight cars. However, customers building new freight cars almost always are required to use only new

6

EOCCs in construction. Thus, customers building new freight cars would be unable to substitute reconditioned EOCCs in building new cars.

18.     Similarly, customers servicing older freight cars that have been in service for more than a decade almost always choose reconditioned EOCCs because the cost of reconditioned units is substantially lower than the cost of new units. Thus, customers are unlikely to substitute new EOCCs for reconditioned EOCCs for use on older freight cars.

19.     A small but significant increase in the price of new EOCCs would not cause purchasers to substitute draft gear, elastomeric devices, intermodal cars, or reconditioned EOCCs so as to make such a price increase unprofitable. Accordingly, the design, manufacture, and sale of new EOCCs is a separate and distinct line of commerce and a relevant product market for the purpose of analyzing the effects of the acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act.

20.     A small but significant increase in the price of reconditioned EOCCs would not cause purchasers to substitute draft gear, elastomeric devices, intermodal cars, or new EOCCs so as to make such a price increase unprofitable. Accordingly, the design, manufacture, and sale of reconditioned EOCCs is a separate and distinct line of commerce and a relevant product market for the purpose of analyzing the effects of the acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act.

**B.     The Relevant Geographic Market**

21.     All EOCCs in the United States are designed, manufactured, and sold in the United States. Amsted sells, and FMI sold, EOCCs to customers located throughout the United States.

22.    The United States is the relevant geographic market for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act.

**C.    Anticompetitive Effects**

23.    Before Amsted's acquisition of FMI, the markets for EOCCs were highly concentrated. For new EOCCs, the merging entities were the only two suppliers. For reconditioned EOCCs, the market was limited to three suppliers, and the merging parties had a combined market share of over 80%. The markets became substantially more concentrated following the acquisition. Using the Herfindahl-Hirschman Index ("HHI"), an explanation of which appears in Appendix A attached hereto, the transaction resulted in a post-merger concentration of over 7000 (an increase of over 2700) in the market for reconditioned EOCCs, while the consolidation in the market for new EOCCs resulted in a monopoly.

24.    Amsted and FMI directly constrained each other's prices, limiting overall price increases for new and reconditioned EOCCs despite significant materials cost increases. Before the transaction, Amsted created forecasts that contemplated significant price increases resulting from the merger. These price increases were aimed at achieving certain margin targets each year that would result in total additional profits of over $17 million during the first three years following the acquisition. According to the forecasts, achieving this goal would require an overall price increase of 4% in 2006, 10% in 2007, and 5% in 2008, beyond increases in costs.

25.    Amsted pricing data shows that Amsted raised prices substantially following its acquisition of FMI. For new EOCCs, customers who did not have the pricing protection of long-term contracts paid on average approximately 14% more in February 2006 than they did in

November 2005. For reconditioned EOCCs, customers without long-term contracts paid an average increase of approximately 5% during the same time period.

26.    Purchasers of new and reconditioned EOCCs in the United States benefitted from the vigorous and aggressive competition between Amsted and FMI through lower prices, higher quality, more innovation, and better service. Without the competitive constraint of head-to-head competition from FMI, Amsted has had and will continue to have the ability to exercise market power by raising prices, lowering product quality, decreasing services, and lessening product innovation.

27.    The acquisition by Amsted of FMI has removed a significant competitor in the already highly concentrated new and reconditioned EOCC markets. The resulting substantial increase in concentration and loss of competition has denied EOCC customers the benefits of competition, in violation of Section 7 of the Clayton Act and Section 2 of the Sherman Act.

**D.     Entry into the Production and Sale of New and Reconditioned EOCCs**

28.    Entry into the design, manufacture, and sale of new or reconditioned EOCCs will not be timely, likely, or sufficient to counter the anticompetitive effects of the transaction. A new entrant to either market would require certifications and approvals from the Association of American Railroads ("AAR"), including facility certification and design certification for each EOCC model to be manufactured or reconditioned. Additionally, the AAR requires that a new entrant undergo a conditional approval period during which production is monitored and significantly limited.

9

29.    It is essential that a new entrant into either the new or reconditioned EOCC markets have sufficient technical know-how regarding the product in order to design and sell EOCCs. Thus, a new entrant must invest in significant design and engineering expertise in order to create the necessary tooling and intellectual property required to successfully manufacture new or reconditioned EOCCs according to AAR standards and railroad customer requirements.

30.    A new entrant into the new or reconditioned EOCC markets also must produce EOCCs in sufficient quantities and with sufficiently consistent quality to assure railroad customers that the new and reconditioned EOCCs will provide the necessary level of cushioning required to protect sensitive cargo. Achieving this quality reputation requires an additional investment in time and money by any new entrant.

31.    Although the manufacturing processes for new and reconditioned EOCCs are similar, both require unique inputs that are not readily available in the marketplace. For example, the manufacture of new EOCCs requires the use of patented designs and proprietary molds that are not needed in the reconditioning process. Similarly, the manufacture of reconditioned EOCCs requires the application of certain machining techniques and testing processes that are unique to the EOCC reconditioning market.

32.    Therefore, entry by any firm into the new or reconditioned EOCC markets would not be timely, likely, or sufficient to counter anticompetitive price increases imposed by Amsted.

10

VI.

FIRST CAUSE OF ACTION

(Violation of Section 7 of the Clayton Act)

33.     The United States incorporates the allegations of paragraphs 1 through 32 above.

34.     On or about December 1, 2005, Amsted acquired FMI and its associated EOCC assets used in the manufacture of new and reconditioned EOCCs. The effect of this acquisition has been substantially to lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act.

35.     The transaction has had the following effects, among others:

      a.     competition in the new and reconditioned EOCC markets has been lessened substantially;

      b.     actual and potential competition between Amsted and FMI in the design, manufacture, and sale of new and reconditioned EOCCs in the United States has been eliminated; and

      c.     prices for new and reconditioned EOCCs have increased and likely will continue to increase, the quality of EOCCs likely will decline, innovation relating to EOCCs likely will decline, and services currently offered in the EOCC markets have become and will continue to be less favorable to railroad customers.

11

SECOND CAUSE OF ACTION

(Violation of Section 2 of the Sherman Act)

36.    The United States incorporates the allegations of paragraphs 1 through 32 above.

37.    On or about December 1, 2005, Amsted willfully created monopoly power by acquiring FMI, its only competitor in the manufacture and sale of new EOCCs. The effect of this acquisition has been to create a monopoly in violation of Section 2 of the Sherman Act.

38.    The transaction has had the following effects, among others:

    a.    the combination created a monopoly for the sale of new EOCCs in the United States;

    b.    actual and potential competition between Amsted and FMI in the design, manufacture, and sale of new EOCCs in the United States has been eliminated; and

    c.    prices for new EOCCs have increased and likely will continue to increase, the quality of new EOCCs likely will decline, innovation relating to new EOCCs likely will decline, and services currently offered in the new EOCC market have become and will continue to be less favorable to railroad customers.

VII.

REQUESTED RELIEF

39.    The United States requests that this Court:

a.    Adjudge and decree the acquisition of FMI and its assets by defendant

Amsted to violate Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 2

of the Sherman Act, 15 U.S.C. § 2;

b.    Compel Amsted to divest all FMI EOCC intangible assets, in addition to all

tools and patterns used for imparting the shape, form, or finish of EOCC

components, and to take any further actions necessary to restore the market to

the competitive position that existed prior to the acquisition;

c.    Award the United States the cost of this action; and

d.    Grant the United States such other and further relief as the case requires and

the Court deems just and proper.

13

Respectfully submitted,

April 18, 2007

FOR PLAINTIFF UNITED STATES:

_____
Gerald F. Masoudi
 Bar No. 466120
 Deputy Assistant Attorney General


_____
 Maribeth Petrizzi
  Bar No. 435204
  Chief, Litigation II Section
 Dorothy B. Fountain
  Bar No. 439469
  Assistant Chief, Litigation II Section


_____
J. Robert Kramer II
 Director of Operations


_____
C. Scott Hataway
 Bar No. 473942
 Raven M. Norris
 Robert W. Wilder
  Attorneys
 U.S. Department of Justice
 Antitrust Division, Litigation II Section
 1401 H Street, NW, Suite 3000
 Washington, DC 20530

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the following documents have been

served upon counsel identified below, in the manner indicated, on this 18th day of April 2007:

1)      Complaint;
2)      proposed Final Judgment;
3)      Hold Separate Stipulation and Order;
4)      Competitive Impact Statement; and
5)      Plaintiff United States' Explanation of Consent Decree Procedures.

TO:      **Via hand-delivery:**
             Joe Sims, Esq.
             Jones Day
             51 Louisiana Avenue, N.W.
             Washington, D.C.  20001

C. Scott Hataway
Bar No. 473942
United States Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, D.C.  20530

# APPENDIX A

## HERFINDAHL-HIRSCHMAN INDEX

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of thirty, thirty, twenty, and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$).  The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated and those in which the HHI is in excess of 1800 points are considered to be highly concentrated.  Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the U.S. Department of Justice and the Federal Trade Commission.  *See  Horizontal Merger Guidelines* § 1.51.

15

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Amsted Industries, Inc. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

C. Scott Hataway, Esq.
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3000
Washington, DC 20530
202-514-8380

ATTORNEYS (IF KNOWN)

Joe Sims, Esq.
Jones Day
51 Louisiana Avenue
Washington, DC 20001
202-879-3863

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( ) 1 | ( ) 1 | Incorporated or Principal Place of Business in This State | ( ) 4 | ( ) 4 |
| Citizen of Another State | ( ) 2 | ( ) 2 | Incorporated and Principal Place of Business in Another State | ( ) 5 | ( ) 5 |
| Citizen or Subject of a Foreign Country | ( ) 3 | ( ) 3 | Foreign Nation | ( ) 6 | ( ) 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

- (●) **A. Antitrust**
  - [X] 410 Antitrust

- ( ) **B. Personal Injury/ Malpractice**
  - [ ] 310 Airplane
  - [ ] 315 Airplane Product Liability
  - [ ] 320 Assault, Libel & Slander
  - [ ] 330 Federal Employers Liability
  - [ ] 340 Marine
  - [ ] 345 Marine Product Liability
  - [ ] 350 Motor Vehicle
  - [ ] 355 Motor Vehicle Product Liability
  - [ ] 360 Other Personal Injury
  - [ ] 362 Medical Malpractice
  - [ ] 365 Product Liability
  - [ ] 368 Asbestos Product Liability

- ( ) **C. Administrative Agency Review**
  - [ ] 151 Medicare Act

  Social Security:
  - [ ] 861 HIA ((1395ff)
  - [ ] 862 Black Lung (923)
  - [ ] 863 DIWC/DIWW (405(g)
  - [ ] 864 SSID Title XVI
  - [ ] 865 RSI (405(g)

  Other Statutes
  - [ ] 891 Agricultural Acts
  - [ ] 892 Economic Stabilization Act
  - [ ] 893 Environmental Matters
  - [ ] 894 Energy Allocation Act
  - [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

- ( ) **D. Temporary Restraining Order/Preliminary Injunction**

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

- ( ) **E. General Civil (Other)**    OR    ( ) **F. Pro Se General Civil**

Real Property
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

Personal Property
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

Bankruptcy
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

Prisoner Petitions
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

Property Rights
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

Federal Tax Suits
- [ ] 870 Taxes (US plaintiff or defendant
- [ ] 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- [ ] 610 Agriculture
- [ ] 620 Other Food &Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 RR & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

Other Statutes
- [ ] 400 State Reapportionment
- [ ] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation

- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 900 Appeal of fee determination under equal access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Section 15 of the Clayton Act, 15 U.S.C. Section 25;Section 7 of the Clayton Act, 15 U.S.C. Section 18;Section 2 of the Sherman Act, 15 U.S.C. Section 2

| VII. REQUESTED IN COMPLAINT | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ ............... | Check YES only if demanded in complaint<br>JURY DEMAND: YES ☐  NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 4/18/2007    SIGNATURE OF ATTORNEY OF RECORD _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| | JUDGE: |
| v. | DECK TYPE:    Antitrust |
| AMSTED INDUSTRIES, INC., | DATE STAMP: |
| Defendant. | |

COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

I.

NATURE AND PURPOSE OF THE PROCEEDING

This case was brought because Defendant Amsted Industries, Inc. ("Amsted") acquired

all of the assets of FM Industries, Inc. ("FMI"), a business unit of Progress Rail Services Holding

Corporation, Inc. ("Progress Rail").[1]  On April 25, 2006, Amsted dismantled FMI by firing its

employees and disposing of virtually all FMI plant equipment through an auction.  The United

States filed a civil antitrust Complaint on April 18, 2007, alleging that the acquisition lessened

competition substantially for the design, manufacture, and sale of new and reconditioned end-of-

---

[1]  Progress Rail was subsequently acquired by Caterpillar Inc. on May 16, 2006.

car cushioning units ("EOCCs") in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2. This loss of competition has impacted the rail industry through higher prices, reduced services, and decreased innovation.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, Amsted is required to divest without compensation all intellectual property and other intangible assets that it acquired from Progress Rail. In addition, Amsted is required to grant a perpetual, royalty-free license to certain Amsted-generated intellectual property and notify the United States of future acquisitions related to EOCCs. Under the terms of the Hold Separate Stipulation and Order, Amsted will take steps to ensure that the divested assets remain economically viable during the pendency of the ordered divestiture.

The United States and the defendant have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

II.

DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

*A.     The Parties to the Consummated Transaction*

Amsted is a diversified manufacturer of industrial components for the railroad, vehicular, and construction markets. Its products include a range of railroad car parts, including couplers, side frames, bolsters, draft gears, and EOCCs. Amsted's EOCC sales in the United States are

2

made through its wholly owned subsidiary, ASF-Keystone. ASF-Keystone is a Delaware corporation with its principal place of business in Granite City, IL.

Progress Rail, a wholly owned subsidiary of Caterpillar, Inc., is one of the largest suppliers of new and reconditioned railroad car parts, rail and trackwork components, and railroad car repair services to the railroad industry in the United States. Progress Rail's EOCC sales in the United States were made through its wholly owned subsidiary, FMI, formerly a Texas corporation with its principal place of business and EOCC manufacturing facility in Fort Worth, Texas.

Prior to the merger, Amsted and FMI were the only two manufacturers of new EOCCs and two of only three manufacturers of reconditioned EOCCs. The transaction lessened competition substantially for these products. As a result, prices for new and reconditioned EOCCs have increased and likely will continue to increase, the quality of EOCCs likely will decline, innovation relating to EOCCs likely will decline, and services currently offered in the EOCC markets have become and will continue to be less favorable to railroad customers.

     B.     *The Relevant Product Market: End-of-Car Cushioning Units*

Railroad freight cars undergo considerable stress during transit due to longitudinal forces known as draft and buff forces. Draft forces are pulling forces caused by train acceleration when freight cars are stretched or pulled apart. Buff forces are compressive forces caused by train deceleration when freight cars are pushed together. If not absorbed and dissipated, the energy from draft and buff forces can cause considerable damage to both car and cargo. Freight cars also undergo considerable stress during switching and coupling at train depots. In order for a railroad to connect one freight car to another, it must collide the cars at significant speed. The

impact sustained during switching and coupling, like draft and buff forces, can cause serious damage to sensitive cargo inside a freight car.

Railroads must equip all freight cars with energy absorption devices to mitigate the effects of draft, buff, and coupling stresses. The most common device is known as a draft gear, which provides the minimum protection required for safe railroad operation. Draft gears rely on friction between two steel plates to absorb and dissipate the energy created by longitudinal forces impacting the freight car. Another type of device is commonly referred to as an "elastomeric" device. These devices use an elastic substance (e.g., rubber) and steel coils to absorb the draft, buff, and coupling stresses. Elastomeric devices are lightweight and low cost, but they are not suitable for all applications as they return much of the absorbed energy back into the draft system. Neither draft gears nor elastomers are sufficient to protect sensitive cargos.

When transporting sensitive cargos in traditional freight cars, railroads must use EOCCs to absorb and dissipate the maximum buff, draft, and coupling forces. These devices use hydraulics (e.g., pressurized nitrogen gas and oils) to minimize longitudinal forces and ensure that sensitive cargo is not damaged during transit. Each EOCC unit consists of a piston, shaft, cylinder, end bells, and a rod that attaches the piston to the freight car coupler. Each EOCC-equipped freight car requires two EOCCs, one at each end of the freight car. EOCCs are critical components for freight cars carrying sensitive commodities, such as steel products, automobile products, electronics, lumber, and paper products. Other energy absorption devices, such as draft gears and elastomeric devices, do not provide the necessary level of cushioning required by customers shipping sensitive goods on freight cars. Railroads and new freight car builders do not consider prices or availability of draft gears or elastomeric devices when soliciting prices for EOCCs from prospective suppliers.

4

Though sensitive cargos can be transported by "intermodal" freight cars with articulated connectors, railroads cannot substitute intermodal transportation for freight cars equipped with EOCCs. Intermodal freight cars are specially designed railcars that allow standard cargo containers to be stacked for rail transport. The cars must travel in groups connected by a "slackless" articulated coupling system. The coupling system transfers longitudinal forces to the ends of the intermodal group, protecting the containers from damage. Despite their suitability for certain applications, intermodal freight cars do not provide sufficient cushioning for some sensitive commodities, cannot physically transport certain sensitive commodities (such as automobiles and certain lumber products), and are typically much more expensive to own and operate than freight cars equipped with EOCCs. The intermodal groups must also travel to the same destination due to their slackless connection. Because of these additional costs and operational constraints, intermodal rail transportation in North America tends to be most economical for large shipments manufactured outside of North America and imported by sea. When soliciting prices for EOCCs from prospective suppliers, railroad customers do not consider the cost of transporting goods using intermodal freight cars with articulated connectors.

Railroad customers may use either new or reconditioned EOCCs when equipping freight cars. However, customers building new freight cars are almost always required to use only new EOCCs in construction. Though higher cost, these new units are highly durable and invariably protected by an industry standard ten-year warranty. The vast majority of customers building new freight cars would be unable to use reconditioned EOCCs in construction. Similarly, customers servicing older freight cars that have been in service for more than a decade almost always choose reconditioned EOCCs because the cost of reconditioned units is substantially

lower than the cost of new units. Thus, customers are unlikely to substitute new EOCCs for reconditioned EOCCs for use on older freight cars.

A small but significant increase in the price of new EOCCs would not cause purchasers to substitute draft gear, elastomeric devices, intermodal cars, or reconditioned EOCCs so as to make such a price increase unprofitable. Accordingly, the design, manufacture, and sale of new EOCCs is a separate and distinct line of commerce and a relevant product market for the purpose of analyzing the effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2. Likewise, a small but significant increase in the price of reconditioned EOCCs would not cause purchasers to substitute draft gear, elastomeric devices, intermodal cars, or new EOCCs so as to make such a price increase unprofitable. Accordingly, the design, manufacture, and sale of reconditioned EOCCs is also a separate and distinct line of commerce and a relevant product market for the purpose of analyzing the effects of the acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act.

C.    *The Relevant Geographic Market*

All EOCCs in the United States are designed, manufactured, and sold in the United States. Amsted sells, and FMI sold, EOCCs to customers located throughout the United States. The United States is the relevant geographic market for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act and Section 2 of the Sherman Act.

D.    *The Competitive Effects of the Transaction on End-of-Car Cushioning*

Prior to Amsted's acquisition of FMI, the markets for EOCCs were highly concentrated. For new EOCCs, the merging entities were the only two suppliers.[2]  For reconditioned EOCCs, the market was limited to three suppliers, and the merging parties controlled over 80% of the market.  Thus, the markets were highly concentrated and became substantially more so following the acquisition.  Using the Herfindahl-Hirschman Index ("HHI"),[3] the consolidation in the market for reconditioned EOCCs resulted in a post-merger concentration of over 7000 (an increase of over 2700), while the consolidation in the market for new EOCCs resulted in a monopoly.

Amsted and FMI directly constrained each other's prices, limiting overall price increases for new and reconditioned EOCCs.  Prior to the transaction, Amsted created forecasts that contemplated significant price increases resulting from the merger.  These price increases were aimed at achieving certain margin targets each year that would result in total additional profits of

---

[2]  American Hydraulics, Inc. is the only other manufacturer certified by the Association of American Railroads ("AAR") to build new units.  However, American Hydraulics historically has had no revenue in this product area, and customers uniformly viewed the merging parties as the only suppliers of new EOCCs.

[3]  "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of thirty, thirty, twenty, and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$).  The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.  Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Horizontal Merger Guidelines issued by the U.S. Department of Justice and the Federal Trade Commission. See *Merger Guidelines* ¶ 1.51.

over $17 million during the first three years following the transaction. According to the forecasts, achieving this goal would require an overall price increase of 4% in 2006, 10% in 2007, and 5% in 2008, beyond materials cost increase surcharges. Amsted pricing data shows that Amsted raised prices substantially following its acquisition of FMI. For new EOCCs, customers who did not have the pricing protection of long-term contracts paid on average approximately 14% more in February 2006 than they did in November 2005. For reconditioned EOCCs, customers without long-term contracts paid an average increase of approximately 5% more during the same time period.

Purchasers of new and reconditioned EOCCs in the United States benefitted from vigorous and aggressive competition between Amsted and FMI through lower prices, higher quality, more innovation, and better service. Without the competitive constraint of head-to-head competition from FMI, Amsted has had and will continue to have the ability to exercise market power by raising prices, lowering product quality, lessening innovation, and decreasing the level of services.

Entry into the design, manufacture, and sale of new or reconditioned EOCCs will not be timely, likely, or sufficient to counter the anticompetitive effects of the transaction. A new entrant to either market would require certifications and approvals from the Association of American Railroads ("AAR"), including facility certification and design certification for each EOCC model to be manufactured or reconditioned. Additionally, the AAR requires that a new entrant undergo a conditional approval period during which production is monitored and significantly limited.

It is also essential that a new entrant into either the new or reconditioned EOCC markets have sufficient technical know-how regarding the product in order to design and sell EOCCs. Thus, a new entrant must invest in significant design and engineering expertise in order to create the necessary tooling and intellectual property required to successfully manufacture new or reconditioned EOCCs according to AAR standards and railroad customer requirements.

A new entrant into the new or reconditioned EOCC markets also must produce EOCCs in sufficient quantities and with sufficiently consistent quality to assure railroad customers that the new and reconditioned EOCCs will provide the necessary level of cushioning required to protect sensitive cargo. Achieving this quality reputation requires an additional investment in time and money by any new entrant.

Although the manufacturing processes for new and reconditioned EOCCs are similar, both require unique inputs that are not readily available in the marketplace. For example, the manufacture of new EOCCs requires the use of patented designs and proprietary molds that are not needed in the reconditioning process. Similarly, the manufacture of reconditioned EOCCs requires the application of certain machining techniques and testing processes that are unique to the EOCC reconditioning market.

For these reasons, entry by any firm into the new or reconditioned EOCC markets would not be timely, likely, or sufficient to counter anticompetitive price increases imposed by Amsted.

III.

EXPLANATION OF THE PROPOSED FINAL JUDGMENT

Because the FMI business was discontinued as a result of the transaction and Amsted now has only one facility that manufactures EOCCs, the divestiture of a going concern in this case would be difficult and potentially disruptive to the railroad industry. Instead, the divestiture

9

and license requirements of the proposed Final Judgment are designed to create an independent and economically viable competitor by providing to a new entrant the market-specific intellectual assets needed for successful competition. The proposed Final Judgment requires that Amsted divest these assets, without compensation, to a pre-approved acquirer operating in the railroad industry. Amsted must divest all of the acquired FMI intangible assets and all of the FMI tangible assets used for imparting the shape, form, or finish to EOCC components. The divestiture includes all trademarks, brands, certifications, patents, blueprints, drawings, castings, dies, molds, toolings, fixtures, specifications, quality assurance plans, manufacturing plans, and related financial data.

The proposed Final Judgment also requires Amsted to provide to the acquirer a royalty-free, perpetual license to all Amsted-generated intangible assets and a limited license to the use of all Amsted-generated casting patterns needed for the production of EOCC components. The license should effectively fill any intellectual property gaps in the FMI divestiture package and resolve questions concerning the completeness of the available FMI assets. The license includes all patents, blueprints, drawings, castings, dies, molds, toolings, fixtures, specifications, quality assurance plans, manufacturing plans, and product tracking information.

Combined with readily available manufacturing equipment, these assets will provide the acquirer with immediate access to the technical know-how required to make new and reconditioned EOCCs. The engineering information should accelerate the AAR certification process, while also providing customers with assurance that the designs used by the acquirer are field tested and historically successful. The proposed Final Judgment provides that for the divestiture to be approved, it must be demonstrated to the satisfaction of the United States, in its sole discretion, that the acquirer will enter the market to remedy the competitive harm alleged in

10

the Complaint. The divestiture must be made to an acquirer that in the United States' judgment

has the intent and capability (including the necessary managerial, operational, technical, and

financial capability) to compete effectively in the design, manufacture, and sale of EOCCs; the

divestiture also must be accomplished in a manner that satisfies the United States, in its sole

discretion, that none of the terms of any agreement between an acquirer and the defendant gives

the defendant the ability unreasonably to raise the acquirer's costs, reduce the acquirer's

efficiency, or otherwise interfere in the ability of the acquirer to compete effectively in the

design, manufacture, and sale of EOCCs. The defendant must take all reasonable steps necessary

to accomplish the divestiture quickly and must cooperate with the acquirer.

The proposed Final Judgment requires the defendant, within sixty (60) days after the

filing of the Complaint, or five (5) days after notice of the entry of the Final Judgment by the

Court, whichever is later, (1) to divest the Divested Assets to the acquirer, and (2) to grant the

Supplemental Asset License to the acquirer. The defendant agrees to use its best efforts to

accomplish the license grant and divestiture expeditiously.

In the event that the approved acquirer is unable or unwilling to receive the divested

assets, the Court will appoint a trustee selected by the United States and approved by the Court to

effect the divestiture of the assets to an alternative acquirer acceptable to the United States.

Amsted will pay all costs and expenses of the trustee. The trustee's commission will be

structured so as to provide an incentive for the trustee based on the speed with which the

divestiture is accomplished. After his or her appointment becomes effective, the trustee will file

monthly reports with the Court and the United States setting forth his or her efforts to accomplish

the divestiture. At the end of 60 days, if the divestiture has not been accomplished, the trustee

and the United States will make recommendations to the Court, which shall enter such orders as

11

appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

The proposed Final Judgment requires Amsted to release all industry participants of restrictive covenants that might otherwise inhibit the acquirer's access to employees, customers, or suppliers. Amsted must also release Progress Rail from an acquisition-related "covenant not to compete" if the acquirer is unable to deliver its first manufactured or reconditioned unit within twelve months after the entry of the Final Judgment.

Finally, the proposed Final Judgment prohibits Amsted from acquiring any assets of or any interest in the development, production, or sale of EOCCs in the United States if the value of such acquisition exceeds $1,000,000 without first notifying the United States through procedures set out in the Final Judgment, unless the transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act. This notification requirement runs for a period of ten years.

The provisions of the proposed Final Judgment will facilitate new entry in order to eliminate the anticompetitive effects of the acquisition in the design, manufacture, and sale of EOCCs.

IV.

<u>REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS</u>

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act

12

(15 U.S.C. § 16(a)), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the defendant.

V.

PROCEDURES AVAILABLE FOR MODIFICATION<br>OF THE PROPOSED FINAL JUDGMENT

The United States and the defendant have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> Antitrust Division
> United States Department of Justice
> 1401 H Street, Suite 3000
> Washington, DC 20530

13

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

VI.

ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against the defendant. The United States could have commenced litigation and sought a judicial order requiring Amsted to recreate FMI as a separate business unit that could be divested as a going concern. This alternative would have substantially delayed relief while introducing a significant risk that the divestiture would be unsuccessful. This alternative may have also increased the potential for harm to the markets through supply disruption and a decrease in available capacity. The United States is satisfied that the divestiture and license described in the proposed Final Judgment will facilitate entry in order to recreate competition for the design, manufacture, and sale of EOCCs in the relevant markets identified by the United States, and thus would achieve substantially all of the relief that the United States would have obtained through litigation, but without the cost and risks associated with trial.

VII.

STANDARD OF REVIEW UNDER THE APPA<br>FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

14

(A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties.  *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public."  *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Courts have held that:

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

15

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4]  In making its public interest

determination, a district court must accord due respect to the government's prediction as to the

effect of proposed remedies, its perception of the market structure, and its views of the nature of

the case.  *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

 Court approval of a final judgment requires a standard that is more flexible and less strict

than the standard required for a finding of liability.  "[A] proposed decree must be approved even

if it falls short of the remedy the court would impose on its own, as long as it falls within the

range of acceptability or is 'within the reaches of public interest.'"  *United States v. Am. Tel. &*

*Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v.*

*Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*,

460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622

(W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a

greater remedy).  The Court "must accord deference to the government's predications about the

efficacy of its remedies, and may not require the remedies to perfectly match the alleged

violations because this may only reflect underlying weaknesses in the government's case or

concessions made during negotiations." *United States v. SBC Commc'ns, Inc.*, Nos. 05-2102 and

05-2103, 2007 WL 1020746, at *16 (D.D.C. Mar. 29, 2007).

---

 [4] *Cf. BNS*, 858 F.2d at 463 (holding that the court's "ultimate authority under the
[APPA] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at
716 (noting that, in this way, the court is constrained to "look at the overall picture not
hypercritically, nor with a microscope, but with an artist's reducing glass").  *See generally*
*Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so
inconsonant with the allegations charged as to fall outside of the 'reaches of the public
interest'").

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Commc'ns*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, at *14.

In 2004, Congress amended the APPA to ensure that courts take into account the above-quoted list of relevant factors when making a public interest determination. *Compare* 15 U.S.C. § 16(e) (2004) *with* 15 U.S.C. § 16(e)(1) (2006) (substituting "shall" for "may" in directing relevant factors for court to consider and amending list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms). These amendments, however, did not change the fundamental role of courts in reviewing proposed settlements. To the contrary, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16 (e)(2). This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the

17

effect of vitiating the benefits of prompt and less costly settlement through the consent decree

process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the
> Court, in making its public interest finding, should . . . carefully consider the
> explanations of the government in the competitive impact statement and its responses
> to comments in order to determine whether those explanations are reasonable under
> the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980

(W.D. Mo. 1977).

This Court recently examined the role of the district court in reviewing proposed final

judgments in light of the 2004 amendments, confirming that the amendments "effected minimal

changes[] and that this Court's scope of review remains sharply proscribed by precedent and the

nature of Tunney Act proceedings." *See United States v. SBC Commc'ns, Inc.*, Nos. 05-2102 and

05-2103, 2007 WL 1020746, at *9 (D.D.C. Mar. 29, 2007). This Court concluded that the

amendments did not alter the articulation of the public interest standard in *Microsoft*. *Id.* at *15.

VIII.

<u>DETERMINATIVE DOCUMENTS</u>

There are no determinative materials or documents within the meaning of the APPA that

were considered by the United States in formulating the proposed Final Judgment.

18

Dated: April 18, 2007

Respectfully submitted,

C. Scott Hataway

Bar No. 473942

U.S. Department of Justice

Antitrust Division, Lit II Section

1401 H Street NW

Washington, DC 20530

202-514-8380

19

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  <br> )  <br> *Plaintiff,*  )  <br> )  <br> v.  )  <br> )  <br> AMSTED INDUSTRIES, INC.,  )  <br> )  <br> *Defendant.*  )  <br> ) | CASE NO.:  <br><br> JUDGE:  <br><br> DECK TYPE: Antitrust  <br><br> DATE STAMP:  <br><br> FILED: April 18, 2007 |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on April 18, 2007, and the United States and defendant, Amsted Industries, Inc. ("Amsted"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Amsted agrees to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights and assets by Amsted to assure that competition is substantially restored;

AND WHEREAS, the United States requires Amsted to make certain divestitures, grant certain licenses, release all market participants of any Restrictive Covenants, and provide

notification of any future transactions within 10 years of this Final Judgment for the purpose of remedying the lost competition alleged in the Complaint;

AND WHEREAS, Amsted has represented to the United States that the divestitures, license grants, release of Restrictive Covenants, and notification of future transactions, as required below, can and will be made and that Amsted will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Amsted under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

## II. **Definitions**

As used in this Final Judgment:

A.     "Amsted" means defendant Amsted Industries, Inc., a Delaware corporation with its headquarters in Chicago, IL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

2

B.    "FMI" means FM Industries, Inc., a Texas corporation and former subsidiary of Progress Rail, engaged in the development, production, and sale of EOCCs until it was acquired by Amsted on December 1, 2005.

C.    "Progress Rail" means Progress Rail Services Holding Corporation, a Delaware corporation with headquarters in Albertville, AL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents and employees.

D.    "EOCC" means end-of-car cushioning unit, a hydraulic energy absorption device used to absorb and dissipate buff, draft, and coupling forces exerted on freight railcars.

E.    "Acquirer" means Wabtec Corporation, the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License.

F.    "Alternative Acquirer" means the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License in the event that the Acquirer is unable or unwilling to receive the Divested Assets or the Supplemental Asset License.

G.    "Divested Assets" means all FMI intangible assets owned or controlled by Amsted and all FMI tools and patterns owned or controlled by Amsted and used for imparting the shape, form, or finish to EOCC components, including:

1.    all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

2.    all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing

3

process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

3.   all dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages;

4.   all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, regulatory certifications, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance, and rejection criteria, and all related empirical performance measurements, data, and reports;

5.   all supplier contact lists, customer contact lists, material lists, materials safety data sheets, substitute material lists, historic pricing and sales volume information, customer complaints, product serialization data, warranty information, product failure reports, market analyses, and all contracts, agreements, leases, commitments, or understandings with suppliers or customers;

6.   all intellectual property ("IP") assets or rights that have been used in the development, production, servicing, and sale of EOCCs, including but not limited to the names "FMI," "FM Industries," and "Freight Master," all

4

patents, including FMI's patented active draft technology (U.S. patent

number 6,237,733 "Internal neutral Positioning Spring"), all licenses, rights,

and sublicenses, trademarks, trade names, service marks, service names,

technical information, computer software and related documentation,

know-how, trade secrets, approvals, certifications, advertising literature, and

all manuals and technical information provided to the employees, customers,

suppliers, agents, or licensees of FMI; and

7.   all research data concerning historic and current research and

development efforts, including designs of experiments, and the results of

unsuccessful designs and experiments relating to the production and design

of EOCCs.

Among the Divested Assets, the divestiture of U.S. Patent number 6,237,733 "Internal Neutral

Positioning Spring" will be transferred subject to a perpetual, royalty-free license to Amsted.

H.    "Person" means any natural person, corporate entity, partnership, association, joint

venture, government entity, or trust.

I.    "Restrictive Covenants" means all agreements, contracts, understandings, or

arrangements between Amsted and any other person restricting competition in the development,

production, and sale of EOCCs, including non-compete agreements between Amsted and former

FMI employees; non-compete agreements between Amsted and current or former Amsted

employees; and any exclusivity arrangements between Amsted and any of its suppliers or

customers.  The term Restrictive Covenants does not include Section 8.7 "Post-Closing Non-

Compete" of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005.

5

The term Restrictive Covenants does not include agreements between Amsted and Amsted's current and former employees to the extent those agreements prevent the disclosure of confidential information.

      J.    "Supplemental Asset License" means a perpetual royalty-free license to and copy of all Amsted's intangible assets used in the development, production, or sale of EOCCs, and a limited license to use certain Amsted tangible assets used in the development, production, or sale of EOCCs, including:

      1.    all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

      2.    all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

      3.    the use for two (2) years of all Amsted-owned or controlled dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages employed by Amsted suppliers in the production of EOCC components;

      4.    all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, testing equipment specifications, surface finish instrument specifications,

pressure/leakage testing and specifications, gage specifications, product

validation, qualification, acceptance, and rejection criteria, and all related

empirical performance measurements, data, and reports; and

5.     Amsted's patented active draft technology, U.S. Patent number 6,357,612

"Rail Car Cushioning Device;"

The term "Supplemental Asset License" shall not include tangible or intangible assets exclusively

used in the production or sale of products other than EOCCs, and also shall not include Amsted

cost data, price data, revenue data, research and development information, or customer contract

information.

## III. Applicability

A.     This Final Judgment applies to Amsted, as defined above, and all other persons in

active concert or participation with it who receive actual notice of this Final Judgment by personal

service or otherwise.

B.     Amsted shall require, as a condition of the sale or other disposition of all or

substantially all of their assets or of lesser business units that include the Divested Assets, or the

assets underlying the Supplemental Asset License, that the purchaser will agree to be bound by the

provisions of this Final Judgment.

## IV. Divestiture

A.     Amsted is hereby ordered and directed, within sixty (60) calendar days after the

filing of the Complaint in this matter, or five (5) days after notice of the entry of this Final

Judgment by the Court, whichever is later, to divest the Divested Assets and grant the

Supplemental Asset License to the Acquirer, all in a manner consistent with this Final Judgment.

7

The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) days in total, and shall notify the Court in such circumstances. Amsted agrees to use its best efforts to divest the Divested Assets and grant the Supplemental Asset License as expeditiously as possible. Amsted also agrees that it shall receive no compensation or anything of value for divesting the Divested Assets or granting the Supplemental Asset License pursuant to this Final Judgment.

B.      In accomplishing the divestiture and licenses ordered by this Final Judgment, Amsted promptly shall inform the Acquirer that the Divested Assets and Supplemental Asset License are being conveyed pursuant to this Final Judgment and provide the Acquirer a copy of this Final Judgment. Amsted shall offer to furnish to the Acquirer, subject to customary confidentiality assurances, all information and documents relating to the Divested Assets and Supplemental Asset License customarily provided in a due diligence process, except such information or documents subject to the attorney-client or work-product privileges. Amsted shall make available such information to the United States at the same time that such information is made available to any other person.

C.      Amsted shall permit the Acquirer to have reasonable access to personnel and to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process. Amsted shall provide information giving the identity and function of the personnel involved in the operation and management of both Amsted and FMI to enable the Acquirer to make offers of employment. Amsted will not interfere with any negotiations by the Acquirer to employ any Amsted employee.

D.    Amsted shall unilaterally release all persons from any Restrictive Covenants related to the production, development, or sale of EOCCs.  If after one year from the entry of this Final Judgment, the Acquirer has failed to deliver an EOCC manufactured or reconditioned by the Acquirer to a railroad industry customer, Amsted shall also unilaterally release Progress Rail from Section 8.7 of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005 ("Post-Closing Non-Compete").

E.    Amsted shall preserve and maintain the Divested Assets and the assets licensed under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise impair the value of such assets while the divestiture is pending.

F.    Amsted shall use commercially reasonable efforts to facilitate the transfer of EOCC cores from Amsted's facilities at the request of railroad customers.  Amsted shall take no action the effect of which is to interfere with or impede the transfer of EOCC cores owned by railroad customers to the Acquirer or the ability of the Acquirer to compete effectively in the sale of reconditioned EOCCs.

G.    Amsted shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divested Assets or Supplemental Asset License.

H.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Acquirer as part of an economically viable, ongoing business engaged in the production and sale

9

of EOCCs in the United States. The divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that:

    1.    the Divestiture Assets and Supplemental Asset License will remain viable and that the divestiture will remedy the competitive harm alleged in the Complaint; and

    2.    none of the terms of any agreement between the Acquirer and Amsted gives Amsted the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively in the production and sale of EOCCs.

## V. <u>Appointment of Trustee to Effect Divestiture</u>

A.    In the event that the Acquirer is unable or unwilling to receive the Divested Assets and Supplemental Asset License, Amsted shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divested Assets and the grant of the Supplemental Asset License in a manner consistent with this Final Judgment to an Alternative Acquirer approved by the United States in its sole discretion.

B.    Amsted shall use commercially reasonable efforts to facilitate the transfer of EOCC cores from Amsted's facilities at the request of railroad customers. Amsted shall take no action the effect of which is to interfere with or impede the transfer of EOCC cores owned by railroad customers to the Alternative Acquirer or the ability of the Alternative Acquirer to compete effectively in the sale of reconditioned EOCCs.

C.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section V of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Alternative Acquirer as part of an economically viable, ongoing business engaged in the production and sale of EOCCs in the United States.  The divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that:

1.    the Alternative Acquirer has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the production and sale of EOCCs;

2.    none of the terms of any agreement between the Alternative Acquirer and Amsted gives Amsted the ability unreasonably to raise the Alternative Acquirer's costs, to lower the Alternative Acquirer's efficiency, or otherwise to interfere in the ability of the Alternative Acquirer to compete effectively in the production and sale of EOCCs; and

3.    the Divested Assets and Supplemental Asset License will remain economically viable and the divestiture will remedy the competitive harm alleged in the Complaint.

D.    After the appointment of a trustee becomes effective, only the trustee shall have the right to convey the Divested Assets and Supplemental Asset License.  The trustee shall have the power and authority to accomplish the divestiture to an Alternative Acquirer approved by the United States, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall

11

have such other powers as this Court deems appropriate. The divestiture of the Divested Assets and the grant of the Supplemental Asset License shall be made without any cost to the Alternative Acquirer or any compensation to Amsted. Subject to Section V(E) of this Final Judgment, the trustee may hire at the cost and expense of Amsted any investment bankers, attorneys, accountants, or any other agents and outside contractors who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

      E.      Amsted shall not object to a grant or conveyance by the trustee on any ground other than the trustee's malfeasance. Any such objections by Amsted must be in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

      F.      The trustee shall serve at the cost and expense of Amsted, on such terms and conditions as the United States approves, and shall account for all costs incurred from the conveyance of the Divested Assets and Supplemental Asset License. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the fair market value of the Divested Assets and Supplemental Asset License, and based on a fee arrangement providing the trustee with an incentive based on the speed with which the divestiture is accomplished.

      G.      Amsted shall use its best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities relating to the assets to be divested, and the Supplemental Asset License; and Amsted shall develop financial and other information relevant to such business as the trustee may reasonably

12

request, subject to customary confidentiality protection. Amsted shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

H.    After appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset License and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divested Assets or grant the Supplemental Asset License.

I.    If the trustee has not accomplished such divestiture within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

13

## VI. **Notice of Proposed Divestiture**

A.    Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Amsted of any proposed divestiture required by Section V of this Final Judgment.  The notice shall set forth the details of the proposed divestiture and grant of the Supplemental Asset License, and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divested Assets or the Supplemental Asset License together with full details of the same.

B.    Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Amsted, the proposed Alternative Acquirer, any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Alternative Acquirer, and any other potential Alternative Acquirer.  Amsted and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.    Within (a) thirty (30) calendar days after receipt of the notice or (b) twenty (20) calendar days after the United States has been provided the additional information requested from Amsted, the proposed Alternative Acquirer, any third party, or the trustee, whichever is later, the United States shall provide written notice to Amsted and the trustee stating whether or not it objects to the proposed divestiture.  If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Amsted's limited right to object to the conveyance under Section V(E) of this Final Judgment.  Absent written notice that the United States does not object to the proposed Alternative Acquirer or upon objection by the United States,

14

the divestiture proposed under Section V shall not be consummated.  Upon objection by Amsted

under Section V(E), the divestiture proposed under Section V shall not be consummated unless

approved by the Court.

## VII. <u>Financing</u>

Amsted shall not finance all or any part of any purchase or divestiture made pursuant to

Section IV or V of this Final Judgment.

## VIII. <u>Hold Separate</u>

Until the divestiture required by this Final Judgment has been accomplished, Amsted shall

take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this

Court.  Amsted shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. <u>Affidavits</u>

A.        Within twenty (20) calendar days of the filing of the Complaint in this matter, and

every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV

or V, Amsted shall deliver to the United States an affidavit as to the fact and manner of its

compliance with Section IV or V of this Final Judgment.  Each such affidavit shall describe in

detail each contact with any person who, during the preceding thirty (30) days, made an offer to

acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or

made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset

License including the Acquirer or any potential Alternative Acquirer.  Each such affidavit shall

also include a description of the efforts Amsted has taken to convey the Divested Assets and

Supplemental Asset License, and to provide required information to the Acquirer, including the

limitations, if any, on such information.  Assuming the information set forth in the affidavit is true

and complete, any objection by the United States to information provided by Amsted, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, Amsted shall deliver to the United States an affidavit that describes all actions Amsted has taken and all steps Amsted has implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Amsted shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Amsted's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.    Amsted shall keep all records of all efforts made to preserve the Divested Assets and to convey the Divested Assets and Supplemental Asset License until one year after such divestiture has been completed.

## X. Compliance Inspection

A.    For the purpose of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Amsted, be permitted:

1.    access during Amsted's office hours to inspect and copy, or at the United States' option, to require Amsted to provide copies of, all books, ledgers,

accounts, records and documents in the possession, custody, or control of Amsted, relating to any matters contained in this Final Judgment; and

2.     to interview, either informally or on the record, Amsted's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Amsted.

B.     Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Amsted shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If at the time information or documents are furnished by Amsted to the United States, Amsted represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Amsted marks each pertinent page of such material, "Subject to claim of

17

protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Amsted ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. Notification of Future Transactions

A.      Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Amsted shall not, without notifying the United States, directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity, or management interest, in the development, production, or sale of EOCCs in the United States if the value of such acquisition exceeds $1,000,000.  This notification requirement shall run for a period of ten years.

B.      Such notification shall be provided to the United States in the same format as, and per the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 9 of the instructions must be provided only about EOCCs. Notification shall be provided at least thirty (30) days prior to acquiring any such assets or interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction.  If within the 30-day period after notification, representatives of the United States make a written request for additional information, Amsted shall not consummate the proposed transaction or agreement until twenty (20) days after submitting all such additional information.  Early termination of the waiting periods in

18

this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

## XII.  No Reacquisition

Amsted may not reacquire any part of the Divested Assets or any right, title or interest in the Supplemental Asset License during the term of this Final Judgment.

## XIII.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

                                      Court approval subject to procedures of the Antitrust Procedures and
Penalties Act, 15 U.S.C. § 16.


                                        _____

                                        United States District Judge

20

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| v. | JUDGE: |
| AMSTED INDUSTRIES, INC., | DECK TYPE: Antitrust |
| | DATE STAMP: |
| Defendant. | |

## PLAINTIFF UNITED STATES'
## EXPLANATION OF CONSENT DECREE PROCEDURES

Plaintiff United States of America ("United States") submits this short memorandum summarizing the procedures regarding the Court's entry of the proposed Final Judgment. This Judgment would settle this case pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "APPA"), which applies to civil antitrust cases brought and settled by the United States.

1.    Today, the United States has filed a Complaint, proposed Final Judgment, Competitive Impact Statement, and Hold Separate Stipulation and Order. The parties have agreed that the Court may enter the proposed Final Judgment following compliance with the APPA.

2.    The APPA requires that the United States publish the proposed Final Judgment and Competitive Impact Statement in the *Federal Register* and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment. The notice will inform members

of the public that they may submit comments about the proposed Final Judgment to the United States Department of Justice, Antitrust Division (*see* 15 U.S.C. §§ 16(b)-(c)).

3.      During the sixty-day period, the United States will consider, and at the close of that period respond to, any comments that it has received, and it will publish the comments and the United States' responses in the *Federal Register*.

4.      After the expiration of the sixty-day period, the United States will file with the Court the comments and the United States' responses, and it may ask the Court to enter the proposed Final Judgment (unless the United States has decided to withdraw its consent to entry of the Final Judgment, as permitted by Paragraph IV.A of the Hold Separate Stipulation and Order, *see* 15 U.S.C. § 16(d)).

5.      If the United States requests that the Court enter the proposed Final Judgment after compliance with the APPA, 15 U.S.C. §§ 16(e)-(f), then the Court may enter the Final Judgment without a hearing, provided that it concludes that the Final Judgment is in the public interest.

Dated: April 18, 2007

Respectfully submitted,

PLAINTIFF UNITED STATES OF AMERICA:

C. Scott Hataway
  Bar No. 473942
Raven M. Norris
Robert W. Wilder
Attorneys

U.S. Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W.
Suite 3000
Washington, D.C. 20530
Tel: (202) 307-0924

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff,* | ) ) ) | CASE NO.: |
| | ) | JUDGE: |
| v. | ) | DECK TYPE: Antitrust |
| AMSTED INDUSTRIES, INC., | ) ) | DATE STAMP: |
| *Defendant.* | ) ) | FILED: April 18, 2007 |
| | ) | |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

### I.

### DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.    "Amsted" means defendant Amsted Industries, Inc., a Delaware corporation with its headquarters in Chicago, IL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "FMI" means FM Industries, Inc., a Texas corporation and former subsidiary of Progress Rail, engaged in the development, production, and sale of EOCCs until it was acquired by Amsted on December 1, 2005.

C.     "Progress Rail" means Progress Rail Services Holding Corporation, a Delaware corporation with headquarters in Albertville, AL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents and employees.

D.     "EOCC" means end-of-car cushioning unit, a hydraulic energy absorption device used to absorb and dissipate buff, draft, and coupling forces exerted on freight railcars.

E.     "Acquirer" means Wabtec Corporation, the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License.

F.     "Alternative Acquirer" means the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License in the event that the Acquirer is unable or unwilling to receive the Divested Assets or the Supplemental Asset License.

G.     "Divested Assets" means all FMI intangible assets owned or controlled by Amsted and all FMI tools and patterns owned or controlled by Amsted and used for imparting the shape, form, or finish to EOCC components, including:

1.     all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

2.     all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

2

3.    all dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages;

4.    all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, regulatory certifications, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance and rejection criteria, and all related empirical performance measurements, data, and reports;

5.    all supplier contact lists, customer contact lists, material lists, materials safety data sheets, substitute material lists, historic pricing and sales volume information, customer complaints, product serialization data, warranty information, product failure reports, market analyses, and all contracts, agreements, leases, commitments, or understandings with suppliers or customers;

6.    all intellectual property ("IP") assets or rights that have been used in the development, production, servicing, and sale of EOCCs, including but not limited to the names "FMI," "FM Industries," and "Freight Master," all patents, including FMI's patented active draft technology (U.S. patent number 6,237,733 "Internal neutral Positioning Spring"), all licenses, rights, and sublicenses, trademarks, trade names, service marks, service names,

technical information, computer software and related documentation,

know-how, trade secrets, approvals, certifications, advertising literature, and

all manuals and technical information provided to the employees, customers,

suppliers, agents, or licensees of FMI; and

7.     all research data concerning historic and current research and

development efforts, including designs of experiments, and the results of

unsuccessful designs and experiments relating to the production and design

of EOCCs.

Among the Divested Assets, the divestiture of U.S. Patent number 6,237, 733 "Internal Neutral

Positioning Spring" will be transferred subject to a perpetual, royalty-free license to Amsted.

H.     "Person" means any natural person, corporate entity, partnership, association, joint

venture, government entity, or trust.

I.     "Restrictive Covenants" means all agreements, contracts, understandings, or

arrangements between Amsted and any other person restricting competition in the development,

production, and sale of EOCCs, including non-compete agreements between Amsted and former

FMI employees; non-compete agreements between Amsted and current or former Amsted

employees; and any exclusivity arrangements between Amsted and any of its suppliers or

customers.  The term Restrictive Covenants does not include Section 8.7 "Post-Closing Non-

Compete" of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005.

The term Restrictive Covenants does not include agreements between Amsted and Amsted's

current and former employees to the extent those agreements prevent the disclosure of

confidential information.

4

J.    "Supplemental Asset License" means a perpetual royalty-free license to and copy

of all Amsted's intangible assets used in the development, production, or sale of EOCCs, and a

limited license to use certain Amsted tangible assets used in the development, production, or sale

of EOCCs, including:

1.    all detail and arrangement drawings, customer drawings, schematics,

blueprints, designs, design validation testing reports, and design review

notes;

2.    all specifications, manufacturing plans, assembly instructions, standard

operating procedures, and work instructions related to the manufacturing

process, including those related to tool speeds, feeds, special cutting tools,

materials used, grinding and polishing, plating temperatures and processes,

material thicknesses, seals, welding, and heat treatment;

3.    the use for two (2) years of all Amsted-owned or controlled dies, castings,

patterns, molds, models, toolings, fixtures, jigs, and gages employed by

Amsted suppliers in the production of EOCC components;

4.    all safety procedures and quality assurance documentation and instructions,

including quality control plans, inspection frequency and criteria, work

instructions, testing criteria, supplier manufacturing requirements, testing

equipment specifications, surface finish instrument specifications,

pressure/leakage testing and specifications, gage specifications, product

validation, qualification, acceptance, and rejection criteria, and all related

empirical performance measurements, data, and reports; and

5

5.      Amsted's patented active draft technology, U.S. Patent number 6,357,612

"Rail Car Cushioning Device;"

The term "Supplemental Asset License" shall not include tangible or intangible assets exclusively

used in the production or sale of products other than EOCCs, and also shall not include Amsted

cost data, price data, revenue data, research and development information, or customer contract

information.

II.

OBJECTIVES

The Final Judgment filed in this case is intended to ensure Amsted's prompt divestiture of

the Divested Assets and grant of the Supplemental Asset License for the purpose of establishing

an economically viable competitor in the EOCC business in order to remedy the effects that the

United States alleges resulted from Amsted's acquisition of FMI. This Hold Separate Stipulation

and Order ensures, prior to such divestiture and license grant, that Amsted shall preserve and

maintain the Divested Assets and the assets licensed under the Supplemental Asset License and

shall not license, transfer, encumber, or otherwise impair the value of such assets while the

divestiture is pending.

III.

JURISDICTION AND VENUE

The Court has jurisdiction over the parties and subject matter of the complaint, which

alleges that the acquisition of FMI by Amsted violated Section 7 of the Clayton Act, 15 U.S.C. §

18, as amended, and Section 2 of the Sherman Act, 15 U.S.C. § 2, and venue of this action is

proper in the United States District Court for the District of Columbia.

IV.

## COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A

may be filed with and entered by the Court, upon the motion of any party or upon the Court's own

motion, at any time after compliance with the requirements of the Antitrust Procedures and

Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings,

provided that the United States has not withdrawn its consent, which it may do at any time before

the entry of the proposed Final Judgment by serving notice thereof on Amsted and by filing that

notice with the Court.

B.    Amsted shall abide by and comply with the provisions of the proposed Final

Judgment, pending the Final Judgment's entry by the Court, or until expiration of time for all

appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the

date of the signing of this Stipulation by the parties, comply with all the terms and provisions of

the proposed Final Judgment as though the same were in full force and effect as an order of the

Court.

C.    This Stipulation shall apply with equal force and effect to any amended proposed

Final Judgment agreed upon in writing by the parties and submitted to the Court.

D.    In the event (1) the United States has withdrawn its consent, as provided in Section

IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the

time has expired for all appeals of any Court ruling declining entry of the proposed Final

Judgment, and the Court has not otherwise ordered continued compliance with the terms and

provisions of the proposed Final Judgment, then the parties are released from all further

7

obligations under this Hold Separate Stipulation and Order, and the making of this Hold Separate

Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

E.    Amsted represents that the divestitures, grants, licenses, rights, and agreements

ordered in the proposed Final Judgment can and will be made, and that Amsted will later raise no

claim of mistake, hardship, or difficulty of compliance as grounds for asking the Court to modify

any of the provisions contained therein.

V.

HOLD SEPARATE PROVISIONS

Until the divestitures required by the Final Judgment have been accomplished:

A.    Amsted shall preserve and maintain the Divested Assets and the assets licensed

under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise

impair the value of such assets while the divestiture is pending.  Within twenty (20) days after the

entry of the Hold Separate Stipulation and Order, Amsted will inform the United States of the

steps Amsted has taken to comply with this Hold Separate Stipulation and Order.

B.    Amsted shall not, except as part of a divestiture approved by the United States in

accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer,

pledge or otherwise dispose of any of the Divested Assets or the assets licensed under the

Supplemental Asset License.

C.    Amsted shall take no action that would jeopardize, delay, or impede the sale of the

Divested Assets or the grant of the Supplemental Asset License to the Acquirer or Alternative

Acquirer.

8

D.       Amsted shall appoint a person or persons to oversee the Divested Assets and the assets licensed under the Supplemental Asset License who will be responsible for Amsted's compliance with the proposed Final Judgment and Hold Separate Stipulation and Order. This person shall have complete managerial responsibility for the Divested Assets and the assets licensed under the Supplemental Asset License, subject to the provisions of the Final Judgment. In the event such person is unable to perform his duties, Amsted shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should Amsted fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

E.       Amsted shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures or other requirements of the Final Judgment to an Alternative Acquirer acceptable to the United States.

F.       This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestitures required by the proposed Final Judgment or until further order of the Court.

9

Dated: April 18, 2007.

Respectfully submitted,

FOR PLAINTIFF                                  FOR AMSTED
UNITED STATES OF AMERICA                       INDUSTRIES, INC.

C.  Scott Hataway, Esquire                     Joe Sims, Esquire
Bar No. 473942                                 Bar No. 962050
United States Department of Justice            Jones Day
Antitrust Division, Litigation II Section      51 Louisiana Avenue, NW
1401 H Street, NW, Suite 3000                  Washington, DC 20001
Washington, DC 20530                           Telephone No.: (202) 879-3863
Telephone No.: (202) 307-0924


<u>ORDER</u>

IT IS SO ORDERED by the Court, this ____ day of _____ 2007.


_____
United States District Judge

10