UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

APR 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff,* | ) |
| v. | ) Civil Action No. 07-0710 (JDB) |
| AMSTED INDUSTRIES, INC., | ) |
| *Defendant.* | ) |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

I.

### DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.   "Amsted" means defendant Amsted Industries, Inc., a Delaware corporation with its headquarters in Chicago, IL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.   "FMI" means FM Industries, Inc., a Texas corporation and former subsidiary of Progress Rail, engaged in the development, production, and sale of EOCCs until it was acquired by Amsted on December 1, 2005.

C.   "Progress Rail" means Progress Rail Services Holding Corporation, a Delaware corporation with headquarters in Albertville, AL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents and employees.

D.   "EOCC" means end-of-car cushioning unit, a hydraulic energy absorption device used to absorb and dissipate buff, draft, and coupling forces exerted on freight railcars.

E.   "Acquirer" means Wabtec Corporation, the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License.

F.   "Alternative Acquirer" means the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License in the event that the Acquirer is unable or unwilling to receive the Divested Assets or the Supplemental Asset License.

G.   "Divested Assets" means all FMI intangible assets owned or controlled by Amsted and all FMI tools and patterns owned or controlled by Amsted and used for imparting the shape, form, or finish to EOCC components, including:

1.   all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

2.   all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

2

3. all dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages;

4. all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, regulatory certifications, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance and rejection criteria, and all related empirical performance measurements, data, and reports;

5. all supplier contact lists, customer contact lists, material lists, materials safety data sheets, substitute material lists, historic pricing and sales volume information, customer complaints, product serialization data, warranty information, product failure reports, market analyses, and all contracts, agreements, leases, commitments, or understandings with suppliers or customers;

6. all intellectual property ("IP") assets or rights that have been used in the development, production, servicing, and sale of EOCCs, including but not limited to the names "FMI," "FM Industries," and "Freight Master," all patents, including FMI's patented active draft technology (U.S. patent number 6,237,733 "Internal neutral Positioning Spring"), all licenses, rights, and sublicenses, trademarks, trade names, service marks, service names,

       technical information, computer software and related documentation, know-how, trade secrets, approvals, certifications, advertising literature, and all manuals and technical information provided to the employees, customers, suppliers, agents, or licensees of FMI; and

7. all research data concerning historic and current research and development efforts, including designs of experiments, and the results of unsuccessful designs and experiments relating to the production and design of EOCCs.

Among the Divested Assets, the divestiture of U.S. Patent number 6,237,733 "Internal Neutral Positioning Spring" will be transferred subject to a perpetual, royalty-free license to Amsted.

H. "Person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

I. "Restrictive Covenants" means all agreements, contracts, understandings, or arrangements between Amsted and any other person restricting competition in the development, production, and sale of EOCCs, including non-compete agreements between Amsted and former FMI employees; non-compete agreements between Amsted and current or former Amsted employees; and any exclusivity arrangements between Amsted and any of its suppliers or customers. The term Restrictive Covenants does not include Section 8.7 "Post-Closing Non-Compete" of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005. The term Restrictive Covenants does not include agreements between Amsted and Amsted's current and former employees to the extent those agreements prevent the disclosure of confidential information.

J.  "Supplemental Asset License" means a perpetual royalty-free license to and copy of all Amsted's intangible assets used in the development, production, or sale of EOCCs, and a limited license to use certain Amsted tangible assets used in the development, production, or sale of EOCCs, including:

1. all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

2. all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

3. the use for two (2) years of all Amsted-owned or controlled dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages employed by Amsted suppliers in the production of EOCC components;

4. all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance, and rejection criteria, and all related empirical performance measurements, data, and reports; and

    5.    Amsted's patented active draft technology, U.S. Patent number 6,357,612 "Rail Car Cushioning Device;"

The term "Supplemental Asset License" shall not include tangible or intangible assets exclusively used in the production or sale of products other than EOCCs, and also shall not include Amsted cost data, price data, revenue data, research and development information, or customer contract information.

## II.

## OBJECTIVES

The Final Judgment filed in this case is intended to ensure Amsted's prompt divestiture of the Divested Assets and grant of the Supplemental Asset License for the purpose of establishing an economically viable competitor in the EOCC business in order to remedy the effects that the United States alleges resulted from Amsted's acquisition of FMI. This Hold Separate Stipulation and Order ensures, prior to such divestiture and license grant, that Amsted shall preserve and maintain the Divested Assets and the assets licensed under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise impair the value of such assets while the divestiture is pending.

## III.

## JURISDICTION AND VENUE

The Court has jurisdiction over the parties and subject matter of the complaint, which alleges that the acquisition of FMI by Amsted violated Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, and Section 2 of the Sherman Act, 15 U.S.C. § 2, and venue of this action is proper in the United States District Court for the District of Columbia.

IV.

## COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A.     The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on Amsted and by filing that notice with the Court.

B.     Amsted shall abide by and comply with the provisions of the proposed Final Judgment, pending the Final Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.     This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

D.     In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further

obligations under this Hold Separate Stipulation and Order, and the making of this Hold Separate Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

E.   Amsted represents that the divestitures, grants, licenses, rights, and agreements ordered in the proposed Final Judgment can and will be made, and that Amsted will later raise no claim of mistake, hardship, or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

V.

HOLD SEPARATE PROVISIONS

Until the divestitures required by the Final Judgment have been accomplished:

A.   Amsted shall preserve and maintain the Divested Assets and the assets licensed under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise impair the value of such assets while the divestiture is pending. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, Amsted will inform the United States of the steps Amsted has taken to comply with this Hold Separate Stipulation and Order.

B.   Amsted shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the Divested Assets or the assets licensed under the Supplemental Asset License.

C.   Amsted shall take no action that would jeopardize, delay, or impede the sale of the Divested Assets or the grant of the Supplemental Asset License to the Acquirer or Alternative Acquirer.

D. Amsted shall appoint a person or persons to oversee the Divested Assets and the assets licensed under the Supplemental Asset License who will be responsible for Amsted's compliance with the proposed Final Judgment and Hold Separate Stipulation and Order. This person shall have complete managerial responsibility for the Divested Assets and the assets licensed under the Supplemental Asset License, subject to the provisions of the Final Judgment. In the event such person is unable to perform his duties, Amsted shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should Amsted fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

E. Amsted shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures or other requirements of the Final Judgment to an Alternative Acquirer acceptable to the United States.

F. This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestitures required by the proposed Final Judgment or until further order of the Court.

Dated: April 18, 2007.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

*/s/ C. Scott Hataway*

C. Scott Hataway, Esquire
Bar No. 473942
United States Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, NW, Suite 3000
Washington, DC 20530
Telephone No.: (202) 307-0924

FOR AMSTED
INDUSTRIES, INC.

*/s/ Joe Sims*

Joe Sims, Esquire
Bar No. 962050
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone No.: (202) 879-3863

ORDER

IT IS SO ORDERED by the Court, this 26th day of April 2007.

_____
United States District Judge