## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE No.: 1:07-cv-00710 |
| ) | |
| Plaintiff, ) | JUDGE: John D. Bates |
| ) | |
| v. ) | DECK TYPE: Antitrust |
| ) | |
| AMSTED INDUSTRIES, INC., ) | DATE STAMP: |
| ) | |
| Defendant. ) | FILED: July 11, 2007 |

## MOTION AND MEMORANDUM OF PLAINTIFF UNITED STATES
## IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-

(h) ("APPA" or "Tunney Act"), the United States moves for entry of the proposed Final

Judgment filed in this civil antitrust case. Defendant Amsted Industries, Inc. ("Amsted") has

stipulated to the entry of the proposed Final Judgment upon compliance with the APPA and does

not object to entry of this proposed Final Judgment without a hearing. The Competitive Impact

Statement, filed April 18, 2007, explains why entry of the proposed Final Judgment is in the

public interest. The United States is filing with this motion a Certificate of Compliance setting

forth the steps taken by the parties to comply with all applicable provisions of the APPA and

certifying that the statutory waiting periods have expired. Thus, the proposed Final Judgment

may be entered at this time without further hearing if the Court determines that entry is in the

public interest. Entry of the proposed Final Judgment would terminate this action, except that

the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed

Final Judgment and to punish violations thereof.[1]


## MEMORANDUM

### I.    Background

#### A.    Pre-Complaint Investigation

On December 1, 2005, Amsted entered into an Asset Purchase Agreement to acquire all

the assets comprising FM Industries ("FMI"), a wholly owned subsidiary of Progress Rail

Holding Corp.  Pursuant to the Agreement, Amsted paid $8.6 million and transferred to Progress

Rail its Quality Bearings Service roller bearing business unit.  The United States Department of

Justice ("Department") began investigating the competitive effects of the FMI acquisition in

December 2005.  On April 25, 2006, Amsted dismantled FMI by firing its employees and

disposing of virtually all FMI plant equipment through an auction.

The Department considered the potentially competitive effects of the transaction with

respect to a number of rail components and concluded that the combination of Amsted and FMI

lessened competition in one market: end-of-car cushioning units ("EEOCs").

EEOCs are a specialized energy absorption device used when transporting sensitive

cargos on freight cars.  These shock-absorbing devices use hydraulics (e.g., pressurized nitrogen

gas and oils) to minimize longitudinal forces by absorbing and dissipating the maximum buff,

---

[1]  In consent decrees requiring divestitures, it is standard practice to include a
"preservation of assets" clause in the decree and to file a stipulation to ensure that the assets to be
divested remain competitively viable.  That practice was followed here.  Proposed Final
Judgment ¶ VIII.

draft, and coupling forces experienced during transit. By reducing and absorbing the forces

exerted on freight cars, EOCCs ensure that sensitive cargo is not damaged during transit. Each

EOCC unit consists of a piston, shaft, cylinder, end bells, and a rod that attaches the piston to the

freight car coupler. Each EOCC-equipped freight car requires two EOCCs, one at each end of

the freight car. Other energy absorption devices, such as draft gears and elastomeric devices, do

not provide the necessary level of cushioning required by customers shipping sensitive goods on

freight cars. EOCCs therefore are critical components for freight cars carrying sensitive

commodities, such as steel coils, automobile products, electronics, lumber, and paper products.

Railroad customers use either new or reconditioned EOCCs when equipping freight cars.

However, customers building new freight cars almost always are required to use only new

EOCCs in construction. Thus, customers building new freight cars would be unable to substitute

reconditioned EOCCs in building new cars. Similarly, customers servicing older freight cars that

have been in service for more than a decade almost always choose reconditioned EOCCs because

the cost of reconditioned units is substantially lower than the cost of new units. Thus, customers

are unlikely to substitute new EOCCs for reconditioned EOCCs for use on older freight cars. A

small but significant increase in the price of new EOCCs would not cause purchasers to

substitute draft gear, elastomeric devices, intermodal cars, or reconditioned EOCCs so as to make

such a price increase unprofitable. Similarly, a small but significant increase in the price of

reconditioned EOCCs, would not cause purchasers to substitute draft gear, elastomeric devices,

intermodal cars or new EOCCs so as to make a price increase unprofitable.

The Department found that, prior to Amsted's acquisition of FMI, the markets for EOCCs

3

were highly concentrated. For new EOCCs, the merging entities were the only two suppliers.[2]

For reconditioned EOCCs, the market was limited to three suppliers, and the merging parties

controlled over 80% of the market. Accordingly, on April 18, 2007, the Department filed a

Complaint in this Court alleging competitive harm in the EEOC market in the United States.

**B.     The Proposed Final Judgment and Post-Complaint Investigation**

Along with the Complaint, the Department filed the proposed Final Judgment,

Competitive Impact Statement ("CIS") and Hold Separate Stipulation and Order ("HSSO").[3]

The proposed Final Judgment would preserve competition in the production, manufacture, and

sale of EEOCs in the United States through the establishment of an independent and

economically viable competitor by requiring Amsted to provide to a new entrant the market-

specific intellectual assets needed for successful competition. The proposed Final Judgment

identifies Wabtec Corporation as the approved acquirer of these assets. Amsted must divest all

of the intangible assets acquired from FMI and all of the FMI tangible assets used for imparting

the shape, form, or finish to EOCC components. The divestiture includes all trademarks, brands,

certifications, patents, blueprints, drawings, castings, dies, molds, toolings, fixtures,

specifications, quality assurance plans, manufacturing plans, and related financial data.

The proposed Final Judgment also requires Amsted to provide to the acquirer a royalty-

free, perpetual license to all Amsted-generated intangible assets and a limited license to the use

---

[2] One other manufacturer has been certified by the Association of American Railroads to build new units; however, that manufacturer historically has had no revenue in this product area, and customers uniformly viewed the merging parties as the only suppliers of new EOCCs.

[3] In the HSSO, Amsted agreed to comply with both the terms of the HSSO and the proposed Final Judgment pending entry of the proposed Final Judgment by the Court.

4

of all Amsted-generated casting patterns needed for the production of EOCC components. The license should effectively fill any intellectual property gaps in the FMI divestiture package. The license includes all patents, blueprints, drawings, castings, dies, molds, toolings, fixtures, specifications, quality assurance plans, manufacturing plans, and product tracking information.

The Department is confident that the divestiture of FMI's intellectual assets to Wabtec will remedy the violation alleged in the Complaint. Combined with readily available manufacturing equipment, these assets will provide the acquirer with immediate access to the technical know-how required to make new and reconditioned EOCCs. The engineering information should accelerate the necessary Association of American Railroads certification process, while also providing customers with assurance that the designs used by the acquirer are field tested and historically successful. The creation of a new independent competitor in the market is likely to remedy the loss of competition threatened by Amsted's acquisition of FMI. As of this filing, Amsted is making substantial efforts to divest the assets in compliance with the proposed Final Judgment.

## II.    Compliance with the APPA

The APPA requires a sixty-day period for the submission of public comments on a proposed Final Judgment. *See* 15 U.S.C. § 16(b). In compliance with the APPA, the United States filed the CIS in this Court on April 18, 2007; published the CIS in the *Federal Register* on April 30, 2007, *see United States v. Amsted Industries, Inc.,* 72 Fed. Reg. 21286-01, 2007 WL 1234777; and published summaries of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, in *The Washington Post* for seven days beginning on May 7, 2007 and ending on May

13, 2007.

The sixty-day period for public comments ended on July 5, 2007; the Division received

no comments.  As recited in the Certificate of Compliance filed simultaneously with this Motion,

all the requirements of the APPA now have been satisfied.  It is therefore appropriate for the

Court to make the public interest determination required by 15 U.S.C. § 16(e) and to enter the

Final Judgment.

**III.    Standard of Judicial Review Under the APPA for the Proposed Final Judgment**

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty-day comment period, after which the Court shall determine

whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).

In making that determination, the court, in accordance with amendments to the APPA in 2004, is

required to consider:

> (A)    the competitive impact of such judgment, including termination of
> alleged violations, provisions for enforcement and modification, duration
> of relief sought, anticipated effects of alternative remedies actually
> considered, whether its terms are ambiguous, and any other competitive
> considerations bearing upon the adequacy of such judgment that the court
> deems necessary to a determination of whether the consent judgment is in
> the public interest; and

> (B)    the impact of entry of such judgment upon competition in the
> relevant market or markets, upon the public generally and individuals
> alleging specific injury from the violations set forth in the complaint
> including consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States v. SBC Commc'ns, Inc.*, Nos. 05-

2102 and 05-2103, 2007 WL 1020746, at *9-16 (D.D.C. Mar. 29, 2007) (assessing public

interest standard under APPA and effect of 2004 amendments).[4]  Courts in this circuit have held

– both before and after the 2004 amendments – that the United States is entitled to deference in

crafting its antitrust settlements, especially with respect to the scope of its complaint and the

adequacy of its remedy, which are the "two most significant legal questions" relating to a public

interest determination. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir.

1995);[5] *SBC Commc'ns*, 2007 WL 1020746, at *12-*16.

　　　　With respect to the adequacy of the relief secured by the decree, a court may not "engage

in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS,*

*Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666

(9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a
> proposed antitrust consent decree must be left, in the first instance, to the
> discretion of the Attorney General.  The court's role in protecting the
> public interest is one of insuring that the government has not breached its
> duty to the public in consenting to the decree.  The court is required to
> determine not whether a particular decree is the one that will best serve
> society, but whether the settlement is "*within the reaches of the public*
> *interest*."  More elaborate requirements might undermine the effectiveness
> of antitrust enforcement by consent decree.

---

[4]  *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006) (substituting
"shall" for "may" in directing relevant factors for court to consider and amending list of factors
to focus on competitive considerations and to address potentially ambiguous judgment terms).
The 2004 amendments do not affect the substantial precedent in this and other circuits analyzing
the scope and standard of review for APPA proceedings.  *See SBC Commc'ns*, 2007 WL
1020746, at *9 ("[A] close reading of the law demonstrates that the 2004 amendments effected
minimal changes . . . .").

[5]  The *Microsoft* court explained that a court making a public interest determination under
the APPA should consider, among other things, the relationship between the remedy secured and
the specific allegations set forth in the government's complaint, whether the decree is sufficiently
clear, whether enforcement mechanisms are sufficient, and whether the decree may positively
harm third parties. *Microsoft*, 56 F.3d at 1458-62.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[6]  In making its public interest

determination, a district court must accord due respect to the United States's prediction as to the

effect of proposed remedies, its perception of the market structure, and its views of the nature of

the case.  *SBC Commc'ns*, 2007 WL 1020746, at \*16 (United States entitled to "deference" as to

"predictions about the efficacy of its remedies"); *United States v. Archer-Daniels-Midland Co.*,

272 F. Supp. 2d 1, 6 (D.D.C. 2003).

      Court approval of a final judgment requires a standard more flexible and less strict than

the standard required for a finding of liability.  "[A] proposed decree must be approved even if it

falls short of the remedy the court would impose on its own, as long as it falls within the range of

acceptability or is 'within the reaches of public interest.'"  *United States v. AT&T Co.*, 552 F.

Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716); *see also*

*United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the

consent decree even though the court would have imposed a greater remedy).  To meet this

standard, the United States "need only provide a factual basis for concluding that the settlements

are reasonably adequate remedies for the alleged harms."  *SBC Commc'ns*, 2007 WL 1020746, at

\*16.

---

     [6]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).  *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 2007 WL 1020746, at *14.

In its 2004 amendments to the Tunney Act, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 2007 WL

1020746, at *9.[7]

## VIII.   CONCLUSION

For the reasons set forth in this Motion and the CIS, the Court should find the proposed Final

Judgment is in the public interest and should enter the attached proposed Final Judgment without

further hearings.  The United States respectfully requests that the attached Final Judgment be entered

as soon as possible.

Dated: July 11, 2007                                 Respectfully submitted,


                                                     SUZANNE MORRIS
                                                     (D.C. Bar No. 450208 )
                                                     Trial Attorney
                                                     United States Department of Justice
                                                     Antitrust Division, Litigation II Section
                                                     1401 H Street, N.W., Suite 3000
                                                     Washington, DC 20530
                                                     Telephone: (202) 307-1188
                                                     Facsimile: (202) 307-6283

---

[7] *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("[T]he Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of July 2007, I caused a copy of the foregoing Motion and Memorandum of Plaintiff United States in Support of Entry of Final Judgment to be mailed, by U.S. mail, postage prepaid, to the attorneys listed below.

Suzanne Morris

For Amsted Industries, Inc.:

Peter J. Love, Esquire
Joe Sims, Esquire
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 APR 13  PM 1: 56

NANCY M.
MAYER-WHITTINGTON
CLERK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: |
| ) | |
| *Plaintiff,* ) | JUDGE: |
| ) | |
| v. ) | DECK TYPE: Antitrust |
| ) | |
| AMSTED INDUSTRIES, INC., ) | DATE STAMP: |
| ) | |
| *Defendant.* ) | FILED: April 18, 2007 |
| ) | |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on April 18, 2007,
and the United States and defendant, Amsted Industries, Inc. ("Amsted"), by their respective
attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any
issue of fact or law, and without this Final Judgment constituting any evidence against or
admission by any party regarding any issue of fact or law;

AND WHEREAS, Amsted agrees to be bound by the provisions of this Final Judgment
pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain
divestiture of certain rights and assets by Amsted to assure that competition is substantially
restored;

AND WHEREAS, the United States requires Amsted to make certain divestitures, grant
certain licenses, release all market participants of any Restrictive Covenants, and provide

notification of any future transactions within 10 years of this Final Judgment for the purpose of remedying the lost competition alleged in the Complaint;

AND WHEREAS, Amsted has represented to the United States that the divestitures, license grants, release of Restrictive Covenants, and notification of future transactions, as required below, can and will be made and that Amsted will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I.  **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Amsted under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

## II.  **Definitions**

As used in this Final Judgment:

A.      "Amsted" means defendant Amsted Industries, Inc., a Delaware corporation with its headquarters in Chicago, IL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "FMI" means FM Industries, Inc., a Texas corporation and former subsidiary of Progress Rail, engaged in the development, production, and sale of EOCCs until it was acquired by Amsted on December 1, 2005.

C.    "Progress Rail" means Progress Rail Services Holding Corporation, a Delaware corporation with headquarters in Albertville, AL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents and employees.

D.    "EOCC" means end-of-car cushioning unit, a hydraulic energy absorption device used to absorb and dissipate buff, draft, and coupling forces exerted on freight railcars.

E.    "Acquirer" means Wabtec Corporation, the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License.

F.    "Alternative Acquirer" means the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License in the event that the Acquirer is unable or unwilling to receive the Divested Assets or the Supplemental Asset License.

G.    "Divested Assets" means all FMI intangible assets owned or controlled by Amsted and all FMI tools and patterns owned or controlled by Amsted and used for imparting the shape, form, or finish to EOCC components, including:

        1.    all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

        2.    all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing

3

process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

3.     all dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages;

4.     all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, regulatory certifications, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance, and rejection criteria, and all related empirical performance measurements, data, and reports;

5.     all supplier contact lists, customer contact lists, material lists, materials safety data sheets, substitute material lists, historic pricing and sales volume information, customer complaints, product serialization data, warranty information, product failure reports, market analyses, and all contracts, agreements, leases, commitments, or understandings with suppliers or customers;

6.     all intellectual property ("IP") assets or rights that have been used in the development, production, servicing, and sale of EOCCs, including but not limited to the names "FMI," "FM Industries," and "Freight Master," all

4

patents, including FMI's patented active draft technology (U.S. patent number 6,237,733 "Internal neutral Positioning Spring"), all licenses, rights, and sublicenses, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, approvals, certifications, advertising literature, and all manuals and technical information provided to the employees, customers, suppliers, agents, or licensees of FMI; and

7.    all research data concerning historic and current research and development efforts, including designs of experiments, and the results of unsuccessful designs and experiments relating to the production and design of EOCCs.

Among the Divested Assets, the divestiture of U.S. Patent number 6,237,733 "Internal Neutral Positioning Spring" will be transferred subject to a perpetual, royalty-free license to Amsted.

H.    "Person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

I.    "Restrictive Covenants" means all agreements, contracts, understandings, or arrangements between Amsted and any other person restricting competition in the development, production, and sale of EOCCs, including non-compete agreements between Amsted and former FMI employees; non-compete agreements between Amsted and current or former Amsted employees; and any exclusivity arrangements between Amsted and any of its suppliers or customers.  The term Restrictive Covenants does not include Section 8.7 "Post-Closing Non-Compete" of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005.

5

The term Restrictive Covenants does not include agreements between Amsted and Amsted's current and former employees to the extent those agreements prevent the disclosure of confidential information.

      J.    "Supplemental Asset License" means a perpetual royalty-free license to and copy of all Amsted's intangible assets used in the development, production, or sale of EOCCs, and a limited license to use certain Amsted tangible assets used in the development, production, or sale of EOCCs, including:

        1.    all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

        2.    all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

        3.    the use for two (2) years of all Amsted-owned or controlled dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages employed by Amsted suppliers in the production of EOCC components;

        4.    all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, testing equipment specifications, surface finish instrument specifications,

pressure/leakage testing and specifications, gage specifications, product

validation, qualification, acceptance, and rejection criteria, and all related

empirical performance measurements, data, and reports; and

5.    Amsted's patented active draft technology, U.S. Patent number 6,357,612

"Rail Car Cushioning Device;"

The term "Supplemental Asset License" shall not include tangible or intangible assets exclusively

used in the production or sale of products other than EOCCs, and also shall not include Amsted

cost data, price data, revenue data, research and development information, or customer contract

information.

## III. Applicability

A.    This Final Judgment applies to Amsted, as defined above, and all other persons in

active concert or participation with it who receive actual notice of this Final Judgment by personal

service or otherwise.

B.    Amsted shall require, as a condition of the sale or other disposition of all or

substantially all of their assets or of lesser business units that include the Divested Assets, or the

assets underlying the Supplemental Asset License, that the purchaser will agree to be bound by the

provisions of this Final Judgment.

## IV. Divestiture

A.    Amsted is hereby ordered and directed, within sixty (60) calendar days after the

filing of the Complaint in this matter, or five (5) days after notice of the entry of this Final

Judgment by the Court, whichever is later, to divest the Divested Assets and grant the

Supplemental Asset License to the Acquirer, all in a manner consistent with this Final Judgment.

The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) days in total, and shall notify the Court in such circumstances. Amsted agrees to use its best efforts to divest the Divested Assets and grant the Supplemental Asset License as expeditiously as possible. Amsted also agrees that it shall receive no compensation or anything of value for divesting the Divested Assets or granting the Supplemental Asset License pursuant to this Final Judgment.

B.    In accomplishing the divestiture and licenses ordered by this Final Judgment, Amsted promptly shall inform the Acquirer that the Divested Assets and Supplemental Asset License are being conveyed pursuant to this Final Judgment and provide the Acquirer a copy of this Final Judgment. Amsted shall offer to furnish to the Acquirer, subject to customary confidentiality assurances, all information and documents relating to the Divested Assets and Supplemental Asset License customarily provided in a due diligence process, except such information or documents subject to the attorney-client or work-product privileges. Amsted shall make available such information to the United States at the same time that such information is made available to any other person.

C.    Amsted shall permit the Acquirer to have reasonable access to personnel and to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process. Amsted shall provide information giving the identity and function of the personnel involved in the operation and management of both Amsted and FMI to enable the Acquirer to make offers of employment. Amsted will not interfere with any negotiations by the Acquirer to employ any Amsted employee.

D.    Amsted shall unilaterally release all persons from any Restrictive Covenants related to the production, development, or sale of EOCCs. If after one year from the entry of this Final Judgment, the Acquirer has failed to deliver an EOCC manufactured or reconditioned by the Acquirer to a railroad industry customer, Amsted shall also unilaterally release Progress Rail from Section 8.7 of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005 ("Post-Closing Non-Compete").

E.    Amsted shall preserve and maintain the Divested Assets and the assets licensed under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise impair the value of such assets while the divestiture is pending.

F.    Amsted shall use commercially reasonable efforts to facilitate the transfer of EOCC cores from Amsted's facilities at the request of railroad customers. Amsted shall take no action the effect of which is to interfere with or impede the transfer of EOCC cores owned by railroad customers to the Acquirer or the ability of the Acquirer to compete effectively in the sale of reconditioned EOCCs.

G.    Amsted shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divested Assets or Supplemental Asset License.

H.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Acquirer as part of an economically viable, ongoing business engaged in the production and sale

of EOCCs in the United States. The divestiture shall be accomplished so as to satisfy the United

States, in its sole discretion, that:

1.     the Divestiture Assets and Supplemental Asset License will remain viable

and that the divestiture will remedy the competitive harm alleged in the

Complaint; and

2.     none of the terms of any agreement between the Acquirer and Amsted gives

Amsted the ability unreasonably to raise the Acquirer's costs, to lower the

Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer

to compete effectively in the production and sale of EOCCs.

### V.  Appointment of Trustee to Effect Divestiture

A.     In the event that the Acquirer is unable or unwilling to receive the Divested Assets

and Supplemental Asset License, Amsted shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestiture of the Divested Assets and the grant of

the Supplemental Asset License in a manner consistent with this Final Judgment to an Alternative

Acquirer approved by the United States in its sole discretion.

B.     Amsted shall use commercially reasonable efforts to facilitate the transfer of

EOCC cores from Amsted's facilities at the request of railroad customers. Amsted shall take no

action the effect of which is to interfere with or impede the transfer of EOCC cores owned by

railroad customers to the Alternative Acquirer or the ability of the Alternative Acquirer to

compete effectively in the sale of reconditioned EOCCs.

C.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section V of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Alternative Acquirer as part of an economically viable, ongoing business engaged in the production and sale of EOCCs in the United States.  The divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that:

    1.    the Alternative Acquirer has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the production and sale of EOCCs;

    2.    none of the terms of any agreement between the Alternative Acquirer and Amsted gives Amsted the ability unreasonably to raise the Alternative Acquirer's costs, to lower the Alternative Acquirer's efficiency, or otherwise to interfere in the ability of the Alternative Acquirer to compete effectively in the production and sale of EOCCs; and

    3.    the Divested Assets and Supplemental Asset License will remain economically viable and the divestiture will remedy the competitive harm alleged in the Complaint.

D.    After the appointment of a trustee becomes effective, only the trustee shall have the right to convey the Divested Assets and Supplemental Asset License.  The trustee shall have the power and authority to accomplish the divestiture to an Alternative Acquirer approved by the United States, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall

11

have such other powers as this Court deems appropriate. The divestiture of the Divested Assets and the grant of the Supplemental Asset License shall be made without any cost to the Alternative Acquirer or any compensation to Amsted. Subject to Section V(E) of this Final Judgment, the trustee may hire at the cost and expense of Amsted any investment bankers, attorneys, accountants, or any other agents and outside contractors who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

E.    Amsted shall not object to a grant or conveyance by the trustee on any ground other than the trustee's malfeasance. Any such objections by Amsted must be in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

F.    The trustee shall serve at the cost and expense of Amsted, on such terms and conditions as the United States approves, and shall account for all costs incurred from the conveyance of the Divested Assets and Supplemental Asset License. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the fair market value of the Divested Assets and Supplemental Asset License, and based on a fee arrangement providing the trustee with an incentive based on the speed with which the divestiture is accomplished.

G.    Amsted shall use its best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities relating to the assets to be divested, and the Supplemental Asset License; and Amsted shall develop financial and other information relevant to such business as the trustee may reasonably

12

request, subject to customary confidentiality protection. Amsted shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

H.    After appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset License and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divested Assets or grant the Supplemental Asset License.

I.    If the trustee has not accomplished such divestiture within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestiture

A.     Within two (2) business days following execution of a definitive divestiture

agreement, the trustee shall notify the United States and Amsted of any proposed divestiture

required by Section V of this Final Judgment.  The notice shall set forth the details of the proposed

divestiture and grant of the Supplemental Asset License, and list the name, address, and telephone

number of each person not previously identified who offered or expressed an interest in or desire to

acquire any ownership interest in the Divested Assets or the Supplemental Asset License together

with full details of the same.

. B.     Within fifteen (15) calendar days of receipt by the United States of such notice, the

United States may request from Amsted, the proposed Alternative Acquirer, any other third party,

or the trustee if applicable, additional information concerning the proposed divestiture, the

proposed Alternative Acquirer, and any other potential Alternative Acquirer.  Amsted and the

trustee shall furnish any additional information requested within fifteen (15) calendar days of the

receipt of the request, unless the parties shall otherwise agree.

C.     Within (a) thirty (30) calendar days after receipt of the notice or (b) twenty (20)

calendar days after the United States has been provided the additional information requested from

Amsted, the proposed Alternative Acquirer, any third party, or the trustee, whichever is later, the

United States shall provide written notice to Amsted and the trustee stating whether or not it

objects to the proposed divestiture.  If the United States provides written notice that it does not

object, the divestiture may be consummated, subject only to Amsted's limited right to object to the

conveyance under Section V(E) of this Final Judgment.  Absent written notice that the United

States does not object to the proposed Alternative Acquirer or upon objection by the United States,

14

the divestiture proposed under Section V shall not be consummated.  Upon objection by Amsted

under Section V(E), the divestiture proposed under Section V shall not be consummated unless

approved by the Court.

## VII.  Financing

Amsted shall not finance all or any part of any purchase or divestiture made pursuant to

Section IV or V of this Final Judgment.

## VIII.  Hold Separate

Until the divestiture required by this Final Judgment has been accomplished, Amsted shall

take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this

Court.  Amsted shall take no action that would jeopardize the divestiture ordered by this Court.

## IX.  Affidavits

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and

every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV

or V, Amsted shall deliver to the United States an affidavit as to the fact and manner of its

compliance with Section IV or V of this Final Judgment.  Each such affidavit shall describe in

detail each contact with any person who, during the preceding thirty (30) days, made an offer to

acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or

made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset

License including the Acquirer or any potential Alternative Acquirer.  Each such affidavit shall

also include a description of the efforts Amsted has taken to convey the Divested Assets and

Supplemental Asset License, and to provide required information to the Acquirer, including the

limitations, if any, on such information.  Assuming the information set forth in the affidavit is true

and complete, any objection by the United States to information provided by Amsted, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

  B.  Within twenty (20) calendar days of the filing of the Complaint in this matter, Amsted shall deliver to the United States an affidavit that describes all actions Amsted has taken and all steps Amsted has implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Amsted shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Amsted's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

  C.  Amsted shall keep all records of all efforts made to preserve the Divested Assets and to convey the Divested Assets and Supplemental Asset License until one year after such divestiture has been completed.

## X. Compliance Inspection

  A.  For the purpose of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Amsted, be permitted:

    1.  access during Amsted's office hours to inspect and copy, or at the United States' option, to require Amsted to provide copies of, all books, ledgers,

accounts, records and documents in the possession, custody, or control of

Amsted, relating to any matters contained in this Final Judgment; and

2.    to interview, either informally or on the record, Amsted's officers,

employees, or agents, who may have their individual counsel present,

regarding such matters. The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

Amsted.

B.    Upon the written request of a duly authorized representative of the Assistant

Attorney General in charge of the Antitrust Division, Amsted shall submit written reports, under

oath if requested, relating to any of the matters contained in this Final Judgment as may be

requested.

C.    No information or documents obtained by the means provided in this section shall

be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), or for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time information or documents are furnished by Amsted to the United

States, Amsted represents and identifies in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules

of Civil Procedure, and Amsted marks each pertinent page of such material, "Subject to claim of

17

protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States

shall give Amsted ten (10) calendar days notice prior to divulging such material in any legal

proceeding (other than a grand jury proceeding).

## XI. Notification of Future Transactions

A.      Unless such transaction is otherwise subject to the reporting and waiting period

requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15

U.S.C. § 18a (the "HSR Act"), Amsted shall not, without notifying the United States, directly or

indirectly acquire any assets of or any interest, including any financial, security, loan, equity, or

management interest, in the development, production, or sale of EOCCs in the United States if the

value of such acquisition exceeds $1,000,000. This notification requirement shall run for a period

of ten years.

B.      Such notification shall be provided to the United States in the same format as, and

per the instructions relating to, the Notification and Report Form set forth in the Appendix to Part

803 of Title 16 of the Code of Federal Regulations as amended, except that the information

requested in Items 5 through 9 of the instructions must be provided only about EOCCs.

Notification shall be provided at least thirty (30) days prior to acquiring any such assets or interest,

and shall include, beyond what may be required by the applicable instructions, the names of the

principal representatives of the parties to the agreement who negotiated the agreement, and any

management or strategic plans discussing the proposed transaction. If within the 30-day period

after notification, representatives of the United States make a written request for additional

information, Amsted shall not consummate the proposed transaction or agreement until twenty (20)

days after submitting all such additional information. Early termination of the waiting periods in

18

this paragraph may be requested and, where appropriate, granted in the same manner as is

applicable under the requirements and provisions of the HSR Act and rules promulgated

thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the

filing of notice under this Section shall be resolved in favor of filing notice.

## XII.  No Reacquisition

Amsted may not reacquire any part of the Divested Assets or any right, title or interest in

the Supplemental Asset License during the term of this Final Judgment.

## XIII.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this

Court at any time for further orders and directions as may be necessary or appropriate to carry out

or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to

punish violations of its provisions.

## XIV.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the

date of its entry.

## XV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The parties have complied with the

requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making

copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

                    Court approval subject to procedures of the Antitrust Procedures and
                    Penalties Act, 15 U.S.C. § 16.


                    _____
                    United States District Judge