UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>AMSTED INDUSTRIES, INC.,<br><br>    *Defendant.* | CASE NO.: 07-710<br><br>JUDGE: BATES<br><br>DECK TYPE: Antitrust<br><br>DATE STAMP:<br><br>FILED: April 18, 2007 |

FILED JUL 1 6 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on April 18, 2007, and the United States and defendant, Amsted Industries, Inc. ("Amsted"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Amsted agrees to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights and assets by Amsted to assure that competition is substantially restored;

AND WHEREAS, the United States requires Amsted to make certain divestitures, grant certain licenses, release all market participants of any Restrictive Covenants, and provide

notification of any future transactions within 10 years of this Final Judgment for the purpose of remedying the lost competition alleged in the Complaint;

AND WHEREAS, Amsted has represented to the United States that the divestitures, license grants, release of Restrictive Covenants, and notification of future transactions, as required below, can and will be made and that Amsted will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Amsted under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

## II. Definitions

As used in this Final Judgment:

A. "Amsted" means defendant Amsted Industries, Inc., a Delaware corporation with its headquarters in Chicago, IL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B. "FMI" means FM Industries, Inc., a Texas corporation and former subsidiary of Progress Rail, engaged in the development, production, and sale of EOCCs until it was acquired by Amsted on December 1, 2005.

C. "Progress Rail" means Progress Rail Services Holding Corporation, a Delaware corporation with headquarters in Albertville, AL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents and employees.

D. "EOCC" means end-of-car cushioning unit, a hydraulic energy absorption device used to absorb and dissipate buff, draft, and coupling forces exerted on freight railcars.

E. "Acquirer" means Wabtec Corporation, the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License.

F. "Alternative Acquirer" means the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License in the event that the Acquirer is unable or unwilling to receive the Divested Assets or the Supplemental Asset License.

G. "Divested Assets" means all FMI intangible assets owned or controlled by Amsted and all FMI tools and patterns owned or controlled by Amsted and used for imparting the shape, form, or finish to EOCC components, including:

    1. all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

    2. all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing

   process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

3. all dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages;

4. all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, regulatory certifications, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance, and rejection criteria, and all related empirical performance measurements, data, and reports;

5. all supplier contact lists, customer contact lists, material lists, materials safety data sheets, substitute material lists, historic pricing and sales volume information, customer complaints, product serialization data, warranty information, product failure reports, market analyses, and all contracts, agreements, leases, commitments, or understandings with suppliers or customers;

6. all intellectual property ("IP") assets or rights that have been used in the development, production, servicing, and sale of EOCCs, including but not limited to the names "FMI," "FM Industries," and "Freight Master," all

>   patents, including FMI's patented active draft technology (U.S. patent number 6,237,733 "Internal neutral Positioning Spring"), all licenses, rights, and sublicenses, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, approvals, certifications, advertising literature, and all manuals and technical information provided to the employees, customers, suppliers, agents, or licensees of FMI; and
>
> 7. all research data concerning historic and current research and development efforts, including designs of experiments, and the results of unsuccessful designs and experiments relating to the production and design of EOCCs.

Among the Divested Assets, the divestiture of U.S. Patent number 6,237,733 "Internal Neutral Positioning Spring" will be transferred subject to a perpetual, royalty-free license to Amsted.

H.   "Person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

I.   "Restrictive Covenants" means all agreements, contracts, understandings, or arrangements between Amsted and any other person restricting competition in the development, production, and sale of EOCCs, including non-compete agreements between Amsted and former FMI employees; non-compete agreements between Amsted and current or former Amsted employees; and any exclusivity arrangements between Amsted and any of its suppliers or customers. The term Restrictive Covenants does not include Section 8.7 "Post-Closing Non-Compete" of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005.

The term Restrictive Covenants does not include agreements between Amsted and Amsted's current and former employees to the extent those agreements prevent the disclosure of confidential information.

J. "Supplemental Asset License" means a perpetual royalty-free license to and copy of all Amsted's intangible assets used in the development, production, or sale of EOCCs, and a limited license to use certain Amsted tangible assets used in the development, production, or sale of EOCCs, including:

1. all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

2. all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

3. the use for two (2) years of all Amsted-owned or controlled dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages employed by Amsted suppliers in the production of EOCC components;

4. all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, testing equipment specifications, surface finish instrument specifications,

        pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance, and rejection criteria, and all related empirical performance measurements, data, and reports; and

    5.    Amsted's patented active draft technology, U.S. Patent number 6,357,612 "Rail Car Cushioning Device;"

The term "Supplemental Asset License" shall not include tangible or intangible assets exclusively used in the production or sale of products other than EOCCs, and also shall not include Amsted cost data, price data, revenue data, research and development information, or customer contract information.

### III. Applicability

A.    This Final Judgment applies to Amsted, as defined above, and all other persons in active concert or participation with it who receive actual notice of this Final Judgment by personal service or otherwise.

B.    Amsted shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include the Divested Assets, or the assets underlying the Supplemental Asset License, that the purchaser will agree to be bound by the provisions of this Final Judgment.

### IV. Divestiture

A.    Amsted is hereby ordered and directed, within sixty (60) calendar days after the filing of the Complaint in this matter, or five (5) days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divested Assets and grant the Supplemental Asset License to the Acquirer, all in a manner consistent with this Final Judgment.

The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) days in total, and shall notify the Court in such circumstances. Amsted agrees to use its best efforts to divest the Divested Assets and grant the Supplemental Asset License as expeditiously as possible. Amsted also agrees that it shall receive no compensation or anything of value for divesting the Divested Assets or granting the Supplemental Asset License pursuant to this Final Judgment.

      B.     In accomplishing the divestiture and licenses ordered by this Final Judgment, Amsted promptly shall inform the Acquirer that the Divested Assets and Supplemental Asset License are being conveyed pursuant to this Final Judgment and provide the Acquirer a copy of this Final Judgment. Amsted shall offer to furnish to the Acquirer, subject to customary confidentiality assurances, all information and documents relating to the Divested Assets and Supplemental Asset License customarily provided in a due diligence process, except such information or documents subject to the attorney-client or work-product privileges. Amsted shall make available such information to the United States at the same time that such information is made available to any other person.

      C.     Amsted shall permit the Acquirer to have reasonable access to personnel and to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process. Amsted shall provide information giving the identity and function of the personnel involved in the operation and management of both Amsted and FMI to enable the Acquirer to make offers of employment. Amsted will not interfere with any negotiations by the Acquirer to employ any Amsted employee.

D.   Amsted shall unilaterally release all persons from any Restrictive Covenants related to the production, development, or sale of EOCCs. If after one year from the entry of this Final Judgment, the Acquirer has failed to deliver an EOCC manufactured or reconditioned by the Acquirer to a railroad industry customer, Amsted shall also unilaterally release Progress Rail from Section 8.7 of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005 ("Post-Closing Non-Compete").

E.   Amsted shall preserve and maintain the Divested Assets and the assets licensed under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise impair the value of such assets while the divestiture is pending.

F.   Amsted shall use commercially reasonable efforts to facilitate the transfer of EOCC cores from Amsted's facilities at the request of railroad customers. Amsted shall take no action the effect of which is to interfere with or impede the transfer of EOCC cores owned by railroad customers to the Acquirer or the ability of the Acquirer to compete effectively in the sale of reconditioned EOCCs.

G.   Amsted shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divested Assets or Supplemental Asset License.

H.   Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Acquirer as part of an economically viable, ongoing business engaged in the production and sale

of EOCCs in the United States. The divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that:

1. the Divestiture Assets and Supplemental Asset License will remain viable and that the divestiture will remedy the competitive harm alleged in the Complaint; and

2. none of the terms of any agreement between the Acquirer and Amsted gives Amsted the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively in the production and sale of EOCCs.

### V. Appointment of Trustee to Effect Divestiture

A.  In the event that the Acquirer is unable or unwilling to receive the Divested Assets and Supplemental Asset License, Amsted shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divested Assets and the grant of the Supplemental Asset License in a manner consistent with this Final Judgment to an Alternative Acquirer approved by the United States in its sole discretion.

B.  Amsted shall use commercially reasonable efforts to facilitate the transfer of EOCC cores from Amsted's facilities at the request of railroad customers. Amsted shall take no action the effect of which is to interfere with or impede the transfer of EOCC cores owned by railroad customers to the Alternative Acquirer or the ability of the Alternative Acquirer to compete effectively in the sale of reconditioned EOCCs.

C. Unless the United States otherwise consents in writing, the divestiture pursuant to Section V of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Alternative Acquirer as part of an economically viable, ongoing business engaged in the production and sale of EOCCs in the United States. The divestiture shall be accomplished so as to satisfy the United States, in its sole discretion, that:

1. the Alternative Acquirer has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the production and sale of EOCCs;

2. none of the terms of any agreement between the Alternative Acquirer and Amsted gives Amsted the ability unreasonably to raise the Alternative Acquirer's costs, to lower the Alternative Acquirer's efficiency, or otherwise to interfere in the ability of the Alternative Acquirer to compete effectively in the production and sale of EOCCs; and

3. the Divested Assets and Supplemental Asset License will remain economically viable and the divestiture will remedy the competitive harm alleged in the Complaint.

D. After the appointment of a trustee becomes effective, only the trustee shall have the right to convey the Divested Assets and Supplemental Asset License. The trustee shall have the power and authority to accomplish the divestiture to an Alternative Acquirer approved by the United States, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall

have such other powers as this Court deems appropriate. The divestiture of the Divested Assets and the grant of the Supplemental Asset License shall be made without any cost to the Alternative Acquirer or any compensation to Amsted. Subject to Section V(E) of this Final Judgment, the trustee may hire at the cost and expense of Amsted any investment bankers, attorneys, accountants, or any other agents and outside contractors who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

E. Amsted shall not object to a grant or conveyance by the trustee on any ground other than the trustee's malfeasance. Any such objections by Amsted must be in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

F. The trustee shall serve at the cost and expense of Amsted, on such terms and conditions as the United States approves, and shall account for all costs incurred from the conveyance of the Divested Assets and Supplemental Asset License. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the fair market value of the Divested Assets and Supplemental Asset License, and based on a fee arrangement providing the trustee with an incentive based on the speed with which the divestiture is accomplished.

G. Amsted shall use its best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities relating to the assets to be divested, and the Supplemental Asset License; and Amsted shall develop financial and other information relevant to such business as the trustee may reasonably

request, subject to customary confidentiality protection. Amsted shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

H. After appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset License and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divested Assets or grant the Supplemental Asset License.

I. If the trustee has not accomplished such divestiture within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestiture

A. Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Amsted of any proposed divestiture required by Section V of this Final Judgment. The notice shall set forth the details of the proposed divestiture and grant of the Supplemental Asset License, and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divested Assets or the Supplemental Asset License together with full details of the same.

B. Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Amsted, the proposed Alternative Acquirer, any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Alternative Acquirer, and any other potential Alternative Acquirer. Amsted and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within (a) thirty (30) calendar days after receipt of the notice or (b) twenty (20) calendar days after the United States has been provided the additional information requested from Amsted, the proposed Alternative Acquirer, any third party, or the trustee, whichever is later, the United States shall provide written notice to Amsted and the trustee stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Amsted's limited right to object to the conveyance under Section V(E) of this Final Judgment. Absent written notice that the United States does not object to the proposed Alternative Acquirer or upon objection by the United States,

the divestiture proposed under Section V shall not be consummated. Upon objection by Amsted under Section V(E), the divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Amsted shall not finance all or any part of any purchase or divestiture made pursuant to Section IV or V of this Final Judgment.

## VIII. Hold Separate

Until the divestiture required by this Final Judgment has been accomplished, Amsted shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Amsted shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, Amsted shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall describe in detail each contact with any person who, during the preceding thirty (30) days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset License including the Acquirer or any potential Alternative Acquirer. Each such affidavit shall also include a description of the efforts Amsted has taken to convey the Divested Assets and Supplemental Asset License, and to provide required information to the Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true

and complete, any objection by the United States to information provided by Amsted, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.  Within twenty (20) calendar days of the filing of the Complaint in this matter, Amsted shall deliver to the United States an affidavit that describes all actions Amsted has taken and all steps Amsted has implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Amsted shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Amsted's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.  Amsted shall keep all records of all efforts made to preserve the Divested Assets and to convey the Divested Assets and Supplemental Asset License until one year after such divestiture has been completed.

## X. Compliance Inspection

A.  For the purpose of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Amsted, be permitted:

  1.  access during Amsted's office hours to inspect and copy, or at the United States' option, to require Amsted to provide copies of, all books, ledgers,

accounts, records and documents in the possession, custody, or control of Amsted, relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Amsted's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Amsted.

B. Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Amsted shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by Amsted to the United States, Amsted represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Amsted marks each pertinent page of such material, "Subject to claim of

protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Amsted ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### XI. Notification of Future Transactions

A.  Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Amsted shall not, without notifying the United States, directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity, or management interest, in the development, production, or sale of EOCCs in the United States if the value of such acquisition exceeds $1,000,000. This notification requirement shall run for a period of ten years.

B.  Such notification shall be provided to the United States in the same format as, and per the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 9 of the instructions must be provided only about EOCCs. Notification shall be provided at least thirty (30) days prior to acquiring any such assets or interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction. If within the 30-day period after notification, representatives of the United States make a written request for additional information, Amsted shall not consummate the proposed transaction or agreement until twenty (20) days after submitting all such additional information. Early termination of the waiting periods in

this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

## XII. No Reacquisition

Amsted may not reacquire any part of the Divested Assets or any right, title or interest in the Supplemental Asset License during the term of this Final Judgment.

## XIII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XV. Public Interest Determination

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date:  July 16, 2007

                        Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

                        _____
                        United States District Judge