# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE No.: 1:07-cv-00710 |
| ) | |
| *Plaintiff,* ) | JUDGE: John D. Bates |
| ) | |
| v. ) | DECK TYPE: Antitrust |
| ) | |
| AMSTED INDUSTRIES, INC., ) | DATE STAMP: |
| ) | |
| *Defendant.* ) | FILED: |

## PLAINTIFF'S UNOPPOSED MOTION TO MODIFY FINAL JUDGMENT

Plaintiff, the United States of America ("United States") respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 60(b)(5) and Section XIII of the Final Judgment entered in this matter on July 16, 2007 ("Final Judgment"),[1] to modify the Final Judgment by entering the attached proposed Modified Final Judgment. Defendant, Amsted Industries, Inc. ("Amsted") does not oppose this motion.

Under the terms of the Final Judgment, Amsted was required to divest FM Industries, Inc.'s tangible and intangible assets to Wabtec Corporation ("Wabtec") to enable Wabtec to enter the United States end-of-car cushioning units ("EOCC") market. Paragraph IV.D of the Final Judgment provides that if Wabtec fails to deliver an EOCC manufactured or reconditioned by Wabtec within one year of the entry of the Final Judgment, Progress Rail Services Holding

---

[1]    Section XIII of the Final Judgment provides that "[t]his Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time . . . to modify any of its provisions."

Corporation ("Progress Rail") will be released from its covenant not to compete with Amsted in the market for EOCCs.

The United States seeks a modification of the Final Judgment to allow Wabtec additional time to sell its first EOCC before Progress Rail is released from its covenant not to compete. Plaintiff proposes to modify Paragraph IV.D of the Final Judgment to read as follows:

> Amsted shall unilaterally release all persons from any Restrictive Covenants related to the production, development, or sale of EOCCs. If after eighteen months from the entry of this Final Judgment, the Acquirer has failed to deliver an EOCC manufactured or reconditioned by the Acquirer to a railroad industry customer, Amsted shall also unilaterally release Progress Rail from Section 8.7 of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005 ("Post-Closing Non-Compete").

The proposed modification is equitable in nature and serves the public interest by effectuating the remedy intended in the Final Judgment. Accordingly, the United States respectfully requests that the Court grant the Motion and enter the proposed Modified Final Judgment attached hereto as Exhibit A.

Dated:   July 14, 2008

Respectfully submitted,

SUZANNE MORRIS
(D.C. Bar No. 450208)
Trial Attorney
United States Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, DC 20530
Telephone: (202) 307-1188
Facsimile: (202) 307-6283

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July 2008, I caused a copy of the foregoing

Motion of Plaintiff United States to Modify Final Judgment, by U.S. mail, postage prepaid, to the

attorneys listed below:

_Suzanne Morris_
Suzanne Morris

For Amsted Industries, Inc.:

Peter J. Love, Esquire
Joe Sims, Esquire
Jones Day
51 Louisiana Avenue, NW
Washington, D.C. 20001

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: 1:07-cv-00710 |
| *Plaintiff,* ) | JUDGE: John D. Bates |
| v. ) | DECK TYPE: Antitrust |
| AMSTED INDUSTRIES, INC., ) | DATE STAMP: |
| *Defendant.* ) | |

## MODIFIED FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on April 18, 2007, and the United States and defendant, Amsted Industries, Inc. ("Amsted"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Amsted agrees to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights and assets by Amsted to assure that competition is substantially restored;

AND WHEREAS, the United States requires Amsted to make certain divestitures, grant certain licenses, release all market participants of any Restrictive Covenants, and provide

notification of any future transactions within 10 years of this Final Judgment for the purpose of remedying the lost competition alleged in the Complaint;

AND WHEREAS, Amsted has represented to the United States that the divestitures, license grants, release of Restrictive Covenants, and notification of future transactions, as required below, can and will be made and that Amsted will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Amsted under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

## II. **Definitions**

As used in this Final Judgment:

A.    "Amsted" means defendant Amsted Industries, Inc., a Delaware corporation with its headquarters in Chicago, IL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

2

B.    "FMI" means FM Industries, Inc., a Texas corporation and former subsidiary of Progress Rail, engaged in the development, production, and sale of EOCCs until it was acquired by Amsted on December 1, 2005.

C.    "Progress Rail" means Progress Rail Services Holding Corporation, a Delaware corporation with headquarters in Albertville, AL, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents and employees.

D.    "EOCC" means end-of-car cushioning unit, a hydraulic energy absorption device used to absorb and dissipate buff, draft, and coupling forces exerted on freight railcars.

E.    "Acquirer" means Wabtec Corporation, the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License.

F.    "Alternative Acquirer" means the entity to whom Amsted shall divest the Divested Assets and grant the Supplemental Asset License in the event that the Acquirer is unable or unwilling to receive the Divested Assets or the Supplemental Asset License.

G.    "Divested Assets" means all FMI intangible assets owned or controlled by Amsted and all FMI tools and patterns owned or controlled by Amsted and used for imparting the shape, form, or finish to EOCC components, including:

        1.    all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

        2.    all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing

3

process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

3.    all dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages;

4.    all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, regulatory certifications, testing equipment specifications, surface finish instrument specifications, pressure/leakage testing and specifications, gage specifications, product validation, qualification, acceptance, and rejection criteria, and all related empirical performance measurements, data, and reports;

5.    all supplier contact lists, customer contact lists, material lists, materials safety data sheets, substitute material lists, historic pricing and sales volume information, customer complaints, product serialization data, warranty information, product failure reports, market analyses, and all contracts, agreements, leases, commitments, or understandings with suppliers or customers;

6.    all intellectual property ("IP") assets or rights that have been used in the development, production, servicing, and sale of EOCCs, including but not limited to the names "FMI," "FM Industries," and "Freight Master," all

4

patents, including FMI's patented active draft technology (U.S. patent

number 6,237,733 "Internal neutral Positioning Spring"), all licenses, rights,

and sublicenses, trademarks, trade names, service marks, service names,

technical information, computer software and related documentation,

know-how, trade secrets, approvals, certifications, advertising literature, and

all manuals and technical information provided to the employees, customers,

suppliers, agents, or licensees of FMI; and

7.    all research data concerning historic and current research and

development efforts, including designs of experiments, and the results of

unsuccessful designs and experiments relating to the production and design

of EOCCs.

Among the Divested Assets, the divestiture of U.S. Patent number 6,237,733 "Internal Neutral

Positioning Spring" will be transferred subject to a perpetual, royalty-free license to Amsted.

H.    "Person" means any natural person, corporate entity, partnership, association, joint

venture, government entity, or trust.

I.    "Restrictive Covenants" means all agreements, contracts, understandings, or

arrangements between Amsted and any other person restricting competition in the development,

production, and sale of EOCCs, including non-compete agreements between Amsted and former

FMI employees; non-compete agreements between Amsted and current or former Amsted

employees; and any exclusivity arrangements between Amsted and any of its suppliers or

customers.  The term Restrictive Covenants does not include Section 8.7 "Post-Closing Non-

Compete" of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005.

5

The term Restrictive Covenants does not include agreements between Amsted and Amsted's current and former employees to the extent those agreements prevent the disclosure of confidential information.

    J.    "Supplemental Asset License" means a perpetual royalty-free license to and copy of all Amsted's intangible assets used in the development, production, or sale of EOCCs, and a limited license to use certain Amsted tangible assets used in the development, production, or sale of EOCCs, including:

        1.    all detail and arrangement drawings, customer drawings, schematics, blueprints, designs, design validation testing reports, and design review notes;

        2.    all specifications, manufacturing plans, assembly instructions, standard operating procedures, and work instructions related to the manufacturing process, including those related to tool speeds, feeds, special cutting tools, materials used, grinding and polishing, plating temperatures and processes, material thicknesses, seals, welding, and heat treatment;

        3.    the use for two (2) years of all Amsted-owned or controlled dies, castings, patterns, molds, models, toolings, fixtures, jigs, and gages employed by Amsted suppliers in the production of EOCC components;

        4.    all safety procedures and quality assurance documentation and instructions, including quality control plans, inspection frequency and criteria, work instructions, testing criteria, supplier manufacturing requirements, testing equipment specifications, surface finish instrument specifications,

6

pressure/leakage testing and specifications, gage specifications, product

validation, qualification, acceptance, and rejection criteria, and all related

empirical performance measurements, data, and reports; and

5.   Amsted's patented active draft technology, U.S. Patent number 6,357,612

"Rail Car Cushioning Device;"

The term "Supplemental Asset License" shall not include tangible or intangible assets exclusively

used in the production or sale of products other than EOCCs, and also shall not include Amsted

cost data, price data, revenue data, research and development information, or customer contract

information.

## III.  Applicability

A.   This Final Judgment applies to Amsted, as defined above, and all other persons in

active concert or participation with it who receive actual notice of this Final Judgment by personal

service or otherwise.

B.   Amsted shall require, as a condition of the sale or other disposition of all or

substantially all of their assets or of lesser business units that include the Divested Assets, or the

assets underlying the Supplemental Asset License, that the purchaser will agree to be bound by the

provisions of this Final Judgment.

## IV.  Divestiture

A.   Amsted is hereby ordered and directed, within sixty (60) calendar days after the

filing of the Complaint in this matter, or five (5) days after notice of the entry of this Final

Judgment by the Court, whichever is later, to divest the Divested Assets and grant the

Supplemental Asset License to the Acquirer, all in a manner consistent with this Final Judgment.

7

The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) days in total, and shall notify the Court in such circumstances. Amsted agrees to use its best efforts to divest the Divested Assets and grant the Supplemental Asset License as expeditiously as possible. Amsted also agrees that it shall receive no compensation or anything of value for divesting the Divested Assets or granting the Supplemental Asset License pursuant to this Final Judgment.

B.    In accomplishing the divestiture and licenses ordered by this Final Judgment, Amsted promptly shall inform the Acquirer that the Divested Assets and Supplemental Asset License are being conveyed pursuant to this Final Judgment and provide the Acquirer a copy of this Final Judgment. Amsted shall offer to furnish to the Acquirer, subject to customary confidentiality assurances, all information and documents relating to the Divested Assets and Supplemental Asset License customarily provided in a due diligence process, except such information or documents subject to the attorney-client or work-product privileges. Amsted shall make available such information to the United States at the same time that such information is made available to any other person.

C.    Amsted shall permit the Acquirer to have reasonable access to personnel and to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process. Amsted shall provide information giving the identity and function of the personnel involved in the operation and management of both Amsted and FMI to enable the Acquirer to make offers of employment. Amsted will not interfere with any negotiations by the Acquirer to employ any Amsted employee.

8

D.      Amsted shall unilaterally release all persons from any Restrictive Covenants related to the production, development, or sale of EOCCs.  If after eighteen months from the entry of this Final Judgment, the Acquirer has failed to deliver an EOCC manufactured or reconditioned by the Acquirer to a railroad industry customer, Amsted shall also unilaterally release Progress Rail from Section 8.7 of Amsted's Asset Purchase Agreement with Progress Rail dated December 1, 2005 ("Post-Closing Non-Compete").

E.      Amsted shall preserve and maintain the Divested Assets and the assets licensed under the Supplemental Asset License and shall not license, transfer, encumber, or otherwise impair the value of such assets while the divestiture is pending.

F.      Amsted shall use commercially reasonable efforts to facilitate the transfer of EOCC cores from Amsted's facilities at the request of railroad customers.  Amsted shall take no action the effect of which is to interfere with or impede the transfer of EOCC cores owned by railroad customers to the Acquirer or the ability of the Acquirer to compete effectively in the sale of reconditioned EOCCs.

G.      Amsted shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divested Assets or Supplemental Asset License.

H.      Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV of this Final Judgment shall include the entire Divested Assets and Supplemental Asset License, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Assets and Supplemental Asset License can and will be used by the Acquirer as part of an economically viable, ongoing business engaged in the production and sale

9

of EOCCs in the United States. The divestiture shall be accomplished so as to satisfy the United

States, in its sole discretion, that:

1. the Divestiture Assets and Supplemental Asset License will remain viable
and that the divestiture will remedy the competitive harm alleged in the
Complaint; and

2. none of the terms of any agreement between the Acquirer and Amsted gives
Amsted the ability unreasonably to raise the Acquirer's costs, to lower the
Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer
to compete effectively in the production and sale of EOCCs.

### V. **Appointment of Trustee to Effect Divestiture**

A. In the event that the Acquirer is unable or unwilling to receive the Divested Assets

and Supplemental Asset License, Amsted shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestiture of the Divested Assets and the grant of

the Supplemental Asset License in a manner consistent with this Final Judgment to an Alternative

Acquirer approved by the United States in its sole discretion.

B. Amsted shall use commercially reasonable efforts to facilitate the transfer of

EOCC cores from Amsted's facilities at the request of railroad customers. Amsted shall take no

action the effect of which is to interfere with or impede the transfer of EOCC cores owned by

railroad customers to the Alternative Acquirer or the ability of the Alternative Acquirer to

compete effectively in the sale of reconditioned EOCCs.

C.      Unless the United States otherwise consents in writing, the divestiture pursuant to

Section V of this Final Judgment shall include the entire Divested Assets and Supplemental Asset

License, and shall be accomplished in such a way as to satisfy the United States, in its sole

discretion, that the Divested Assets and Supplemental Asset License can and will be used by the

Alternative Acquirer as part of an economically viable, ongoing business engaged in the

production and sale of EOCCs in the United States.  The divestiture shall be accomplished so as

to satisfy the United States, in its sole discretion, that:

      1.      the Alternative Acquirer has the intent and capability (including the

        necessary managerial, operational, technical, and financial capability) to

        compete effectively in the production and sale of EOCCs;

      2.      none of the terms of any agreement between the Alternative Acquirer and

        Amsted gives Amsted the ability unreasonably to raise the Alternative

        Acquirer's costs, to lower the Alternative Acquirer's efficiency, or

        otherwise to interfere in the ability of the Alternative Acquirer to compete

        effectively in the production and sale of EOCCs; and

      3.      the Divested Assets and Supplemental Asset License will remain

        economically viable and the divestiture will remedy the competitive harm

        alleged in the Complaint.

D.      After the appointment of a trustee becomes effective, only the trustee shall have the

right to convey the Divested Assets and Supplemental Asset License.  The trustee shall have the

power and authority to accomplish the divestiture to an Alternative Acquirer approved by the

United States, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall

have such other powers as this Court deems appropriate. The divestiture of the Divested Assets and the grant of the Supplemental Asset License shall be made without any cost to the Alternative Acquirer or any compensation to Amsted. Subject to Section V(E) of this Final Judgment, the trustee may hire at the cost and expense of Amsted any investment bankers, attorneys, accountants, or any other agents and outside contractors who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

E.      Amsted shall not object to a grant or conveyance by the trustee on any ground other than the trustee's malfeasance. Any such objections by Amsted must be in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

F.      The trustee shall serve at the cost and expense of Amsted, on such terms and conditions as the United States approves, and shall account for all costs incurred from the conveyance of the Divested Assets and Supplemental Asset License. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the fair market value of the Divested Assets and Supplemental Asset License, and based on a fee arrangement providing the trustee with an incentive based on the speed with which the divestiture is accomplished.

G.      Amsted shall use its best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities relating to the assets to be divested, and the Supplemental Asset License; and Amsted shall develop financial and other information relevant to such business as the trustee may reasonably

12

request, subject to customary confidentiality protection. Amsted shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

      H.     After appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset License and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divested Assets or grant the Supplemental Asset License.

      I.     If the trustee has not accomplished such divestiture within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

13

## VI. Notice of Proposed Divestiture

A.      Within two (2) business days following execution of a definitive divestiture

agreement, the trustee shall notify the United States and Amsted of any proposed divestiture

required by Section V of this Final Judgment. The notice shall set forth the details of the proposed

divestiture and grant of the Supplemental Asset License, and list the name, address, and telephone

number of each person not previously identified who offered or expressed an interest in or desire to

acquire any ownership interest in the Divested Assets or the Supplemental Asset License together

with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the

United States may request from Amsted, the proposed Alternative Acquirer, any other third party,

or the trustee if applicable, additional information concerning the proposed divestiture, the

proposed Alternative Acquirer, and any other potential Alternative Acquirer. Amsted and the

trustee shall furnish any additional information requested within fifteen (15) calendar days of the

receipt of the request, unless the parties shall otherwise agree.

C.      Within (a) thirty (30) calendar days after receipt of the notice or (b) twenty (20)

calendar days after the United States has been provided the additional information requested from

Amsted, the proposed Alternative Acquirer, any third party, or the trustee, whichever is later, the

United States shall provide written notice to Amsted and the trustee stating whether or not it

objects to the proposed divestiture. If the United States provides written notice that it does not

object, the divestiture may be consummated, subject only to Amsted's limited right to object to the

conveyance under Section V(E) of this Final Judgment. Absent written notice that the United

States does not object to the proposed Alternative Acquirer or upon objection by the United States,

14

the divestiture proposed under Section V shall not be consummated.  Upon objection by Amsted under Section V(E), the divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII.  **Financing**

Amsted shall not finance all or any part of any purchase or divestiture made pursuant to Section IV or V of this Final Judgment.

### VIII.  **Hold Separate**

Until the divestiture required by this Final Judgment has been accomplished, Amsted shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Amsted shall take no action that would jeopardize the divestiture ordered by this Court.

### IX.  **Affidavits**

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, Amsted shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment.  Each such affidavit shall describe in detail each contact with any person who, during the preceding thirty (30) days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Assets or Supplemental Asset License including the Acquirer or any potential Alternative Acquirer.  Each such affidavit shall also include a description of the efforts Amsted has taken to convey the Divested Assets and Supplemental Asset License, and to provide required information to the Acquirer, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true

15

and complete, any objection by the United States to information provided by Amsted, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.       Within twenty (20) calendar days of the filing of the Complaint in this matter, Amsted shall deliver to the United States an affidavit that describes all actions Amsted has taken and all steps Amsted has implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  Amsted shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Amsted's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.       Amsted shall keep all records of all efforts made to preserve the Divested Assets and to convey the Divested Assets and Supplemental Asset License until one year after such divestiture has been completed.

## X. **Compliance Inspection**

A.       For the purpose of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Amsted, be permitted:

1.       access during Amsted's office hours to inspect and copy, or at the United States' option, to require Amsted to provide copies of, all books, ledgers,

16

accounts, records and documents in the possession, custody, or control of

Amsted, relating to any matters contained in this Final Judgment; and

2.      to interview, either informally or on the record, Amsted's officers,

employees, or agents, who may have their individual counsel present,

regarding such matters.  The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

Amsted.

B.      Upon the written request of a duly authorized representative of the Assistant

Attorney General in charge of the Antitrust Division, Amsted shall submit written reports, under

oath if requested, relating to any of the matters contained in this Final Judgment as may be

requested.

C.      No information or documents obtained by the means provided in this section shall

be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), or for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time information or documents are furnished by Amsted to the United

States, Amsted represents and identifies in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules

of Civil Procedure, and Amsted marks each pertinent page of such material, "Subject to claim of

17

protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Amsted ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. **Notification of Future Transactions**

A.      Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Amsted shall not, without notifying the United States, directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity, or management interest, in the development, production, or sale of EOCCs in the United States if the value of such acquisition exceeds $1,000,000. This notification requirement shall run for a period of ten years.

B.      Such notification shall be provided to the United States in the same format as, and per the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 9 of the instructions must be provided only about EOCCs. Notification shall be provided at least thirty (30) days prior to acquiring any such assets or interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction. If within the 30-day period after notification, representatives of the United States make a written request for additional information, Amsted shall not consummate the proposed transaction or agreement until twenty (20) days after submitting all such additional information. Early termination of the waiting periods in

this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

## XII. No Reacquisition

Amsted may not reacquire any part of the Divested Assets or any right, title or interest in the Supplemental Asset License during the term of this Final Judgment.

## XIII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XV. Public Interest Determination

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before

19

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

                          Court approval subject to procedures of the Antitrust Procedures and
                          Penalties Act, 15 U.S.C. § 16.


                          _____

                          United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE No.:  1:07-cv-00710 |
|  | ) |  |
| *Plaintiff,* | ) | JUDGE: John D. Bates |
|  | ) |  |
| v. | ) | DECK TYPE: Antitrust |
|  | ) |  |
| AMSTED INDUSTRIES, INC., | ) | DATE STAMP: |
|  | ) |  |
| *Defendant.* | ) | FILED: |
|  | ) |  |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**UNOPPOSED MOTION TO MODIFY FINAL JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 60(b)(5) and Section XIII of the Final

Judgment entered in this matter on July 16, 2007 ("Final Judgment"),[1] Plaintiff United States of

America ("United States") has moved the Court to modify the Final Judgment by entering the

proposed Modified Final Judgment submitted with its motion, filed simultaneously herewith.

Defendant, Amsted Industries, Inc. ("Amsted") does not oppose this motion.  As stated below,

the proposed modification is minor and serves the public interest by effectuating the remedy

intended in the Final Judgment.  Accordingly, Plaintiff requests that the Court grant the Motion

to modify the Final Judgment and enter the proposed Modified Final Judgment.

## I.     BACKGROUND

On April 18, 2007, the United States filed a Complaint alleging that the acquisition by

Amsted of all the assets comprising FM Industries, Inc. ("FMI"), a wholly owned subsidiary of

---

[1]      Section XIII of the Final Judgment provides that "[t]his Court retains jurisdiction
to enable any party to this Final Judgment to apply to this Court at any time . . . to modify any of
its provisions."

Progress Rail Holding Corp. ("Progress Rail"), violated Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 2 of the Sherman Act, 15 U.S.C. § 2. The Complaint alleged that the acquisition harmed competition in the end-of-car cushioning units ("EOCC") market in the United States. Along with the Complaint, the United States filed a proposed Final Judgment, Competitive Impact Statement and Hold Separate Stipulation and Order.

The Final Judgment was designed to recreate competition in the production, manufacture and sale of EOCCs in the United States by giving a new entrant the market-specific intellectual property needed for successful competition. The Final Judgment identified Wabtec Corporation ("Wabtec") as the approved acquirer of these assets. The Court entered the Final Judgment on July 16, 2007. On July 23, 2007, Amsted entered into an agreement with Wabtec to divest the required assets. On July 31, 2007, Amsted and Wabtec signed an asset purchase agreement.

In order to compete, however, Wabtec must receive certification from the Association of American Railroads ("AAR"). Both new and reconditioned EOCC units must be approved and certified by the AAR. Accordingly, on August 7, 2007, after receiving FMI's tangible and intangible assets, Wabtec requested that the AAR transfer to Wabtec the technical and quality assurance certifications that FMI had received for its EOCCs. See Declaration of Brian Cunkelman, dated July 10, 2008, attached as Exhibit 1. On August 23, 2007, the AAR denied Wabtec's request, expressing concerns about Wabtec's personnel, experience and equipment. Wabtec worked to address these concerns and invested in its EOCC line by hiring the requisite personnel, purchasing assets, installing a production line and producing reconditioned product samples. Id. On December 10, 2007, Wabtec informed the AAR about its progress and requested guidance from the AAR as to the remaining requirements it

2

would need to meet to receive AAR certification. The AAR responded two months later on February 7, 2008 and provided a list of the inspections and audits needed to obtain AAR approval.

In February 2008, Wabtec started making appointments for the required technical certifications. On March 25, 2008, Wabtec passed the mechanical inspection and on April 9, 2008, it passed the M-1003 inspection. In order to receive certification, Wabtec still must pass an impact test on its EOCCs at Wabtec's Cardwell test facility. Wabtec needed to replace some of its testing equipment before scheduling that test. Wabtec anticipates being ready for the test by July 31, 2008. Wabtec estimates that if its EOCC production passes the impact test, the AAR likely will issue conditional approval for certification of Wabtec's equipment approximately two weeks after the test. Id.

Pursuant to Paragraph IV.D of the Final Judgment, if Wabtec fails to deliver a manufactured or reconditioned EOCC by July 16, 2008, one year from the date of entry of the Final Judgment, Progress Rail will be unilaterally released from its covenant not to compete with Amsted in the market for EOCCs. When the Final Judgment was drafted, the Division sought to remedy a merger to monopoly by providing Wabtec with the assets needed to enter the United States EOCC market. There was some concern, however, that if Wabtec was unsuccessful in entering the EOCC market, the covenant not to compete between Amsted and Progress Rail would act as an unreasonable restraint on competition. Accordingly, the time limit in Paragraph IV.D was inserted to ensure that, in the event that Wabtec's entry did not occur, Progress Rail would be free to enter the market in its place. The United States sought the conditional release of the covenant not to compete after one year based upon the assumption that the AAR would

3

promptly transfer FMI's AAR certification to Wabtec's units and that a one-year period would be

a sufficient time to judge whether Wabtec would successfully enter the market. The United

States had reasonably expected Wabtec to be able to sell its first EOCC prior to July 16, 2008,

but due to conditions beyond Wabtec's control, successful entry cannot occur until after July 16,

2008.

## II.    THE PROPOSED MODIFICATION SERVES THE PUBLIC INTEREST AND SHOULD BE APPROVED

### A.    Applicable Legal Standard

This Court has jurisdiction to modify the Final Judgment pursuant to Section XIII of the

Judgment, the Federal Rules of Civil Procedure, Fed. R. Civ. P. 60(b)(5), and "principles

inherent in the jurisdiction of the chancery." United States v. Swift & Co., 286 U.S. 106, 114

(1932); *see also* In re Grand Jury Proceedings, 827 F. 2d 868, 873 (2d Cir. 1987). Where, as

here, the United States, as plaintiff, unilaterally proposes a modification to a consent judgment

and the modification does not further restrict the defendant's rights or actions, the Court should

apply the same standard as when the United States and the defendant both consent to a

modification. When the government unilaterally seeks to modify a decree, the court evaluates

the modifications in light of both how the additional burdens imposed by the proposed

modifications affect the defendant's due process rights and the public interest. *Cf.* Duran v.

Elrod, 760 F.2d 756, 759 (7th Cir. 1985). However, where both the government and the

defendant consent to modifications, the court focuses solely on the public interest aspects of the

calculus. *See, e.g.*, United States v. W. Elec. Co., 993 F. 2d 1572, 1576 (D.C. Cir. 1993); United

States v. W. Elec. Co., 900 F. 2d 283, 305 (D.C. Cir. 1990); United States v. Loew's, Inc., 783 F.

Supp. 211, 213 (S.D.N.Y. 1992); United States v. Columbia Artists Mgmt., Inc., 662 F. Supp.

4

865, 869-70 (S.D.N.Y. 1987) (citing <u>United States v. Swift & Co.</u>, 1975-1 Trade Cas. (CCH) ¶ 60,201, at 65,702-03 (N.D. Ill. 1975)). Here, the defendant agrees to the modification and the proposed modification does not further impinge the defendant's rights. Accordingly, the court need only evaluate the proposed modifications in light of the public interest. Thus, the issue before the Court is whether modification is in the public interest. This is the same standard that a district court applies in reviewing an initial consent judgment in a government antitrust case. The judiciary's role in determining whether the initial entry of a consent decree is in the public interest, absent a showing of abuse of discretion or a failure to discharge its duty on the part of the government, is to "inquire . . . into the purpose, meaning, and efficacy of the decree." <u>United States v. Microsoft</u>, 56 F.3d 1448, 1462 (D.C. Cir. 1995).

The purpose of the antitrust laws is to protect competition. *See, e.g.*, <u>United States v. Penn-Olin Chem. Co.</u>, 378 U.S. 158, 170 (1964) (antitrust laws reflect "a national policy enunciated by the Congress to preserve and promote a free competitive economy"). The relevant question before the court therefore is whether modification of the Judgment would serve the public interest in "free and unfettered competition as the rule of trade." <u>Northern Pac. Ry. Co. v. United States</u>, 356 U.S. 1, 4 (1958); *see also* <u>United States v. W. Elec. Co.</u>, 900 F.2d at 308; <u>United States v. American Cyanamid</u>, 719 F.2d 558, 565 (2d Cir. 1983), *cert. denied*, 405 U.S. 1101 (1984); <u>United States v. Columbia Artists Mgmt.</u>, 662 F. Supp. 865, 870 (S.D.N.Y. 1987). Here, the Court should modify the decree as requested because it will effectuate the remedy originally intended in the Final Judgment by providing Wabtec the extra time it needs to enter the United States EOCC market.

**B.    The Proposed Modification**

The Final Judgment sought to preserve competition in the production, manufacture and sale of EOCCs in the United States through the establishment of an independent and economically viable competitor by requiring Amsted to provide to a new entrant the market-specific intellectual property needed for successful competition. In the event that Wabtec was unable or unwilling to sell its first EOCC within one year of the date of entry of the Final Judgment, Paragraph IV.D provides that Progress Rail will be unilaterally released from its covenant not to compete with Amsted in the EOCC market. The one-year time limit in Paragraph IV.D of the Final Judgment was an attempt to balance the need to provide Wabtec with the incentive to invest in the EOCC market and the need to ensure that if Wabtec chose not to make the capital investments required for entry, Progress Rail would be free to enter the market in its place.

Wabtec has spent considerable assets and time over the past year in an attempt to enter the EOCC market. It has set up the required production facilities and has the capability to manufacture the finished product. Wabtec needs only to pass an impact test before it can receive final AAR certification and sell its products to the railroad industry. Wabtec and an AAR representative believe that Wabtec likely will pass this last test within the next month. Because Wabtec's imminent entry into the EOCC market could be disadvantaged by the unilateral release of Progress Rail from its covenant not to compete, the United States seeks to modify Paragraph IV.D of the Final Judgment by changing the term "one year" in the second sentence to "eighteen months." The net effect of this modification is that Wabtec will receive an additional six months

6

to mount its entry into the EOCC market. In the event that Wabtec is unsuccessful, Progress Rail will be released from its restrictive covenant.

## III.   ADDITIONAL PUBLIC NOTICE OF THE PROPOSED FINAL JUDGMENT MODIFICATIONS IS UNNECESSARY AND DOES NOT SERVE THE PUBLIC INTEREST

The Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16 (b)-(h), does not expressly apply to the modification of entered final judgments.[2]  Nonetheless, the United States and the courts have concluded that notice to the public and an opportunity for comment are appropriate where significant decree modifications are proposed.[3]  Here, however, the modification is minor and serves only to effectuate what was intended in the Final Judgment. Additionally, all of the parties affected by this modification have been notified. Amsted has agreed to the modification and Progress Rail was notified on July 14, 2008 of Plaintiff's Unopposed Motion to Modify the Final Judgment.

Moreover, this minor change does not harm any of the affected parties. Amsted and Progress Rail entered into the covenant not to compete in an arm's-length transaction. The Final Judgment sought to repeal that covenant only in the event that entry did not occur. Entry, however, appears to be imminent. By contrast, releasing the covenant on July 16, 2008 would in effect punish Wabtec despite its significant efforts to enter. Accordingly, the United States sees no benefit of public notice in this matter and a real public benefit in modifying the Final Judgment

---

[2]      The procedures mandated by the APPA govern federal district courts' consideration of "[a]ny proposal for a consent judgment submitted by the United States," 15 U.S.C. § 16(b), and are designed to facilitate a public interest determination "[b]efore entering any consent judgment proposed by the United States," 15 U.S.C. § 16(e).

[3]      *See United States v. AT&T*, 552 F. Supp. 131, 144-45 (D.D.C. 1982), *aff'd. sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).

to prevent the release of the covenant not to compete. Thus, no notice or public comment period is either necessary or beneficial for a determination that the proposed modification is in the public interest.[4]

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the Motion and enter the proposed Modified Final Judgment.

Dated: July 14, 2008                           Respectfully submitted,

SUZANNE MORRIS
(D.C. Bar No. 450208)
Trial Attorney
United States Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, DC 20530
Telephone: (202) 307-1188
Facsimile: (202) 307-6283

---

[4]    Few courts have addressed the issue of the applicability of the APPA to judgment modifications. Courts in this district have made non-material modifications of final judgments without requiring notice to the public and opportunity for comments. *United States v. Tidewater, Inc., et al.*, Civil Action No. 92-106 (D.D.C. October 7, 1992) (Hogan, J.); *United States v. Baker Hughes*, Civil Action No. 90-0825 (D.D.C. June 20, 1990) (Oberdorfer, J.).

Two courts have further held that the APPA is not applicable to judgment termination proceedings, suggesting that those courts would not view the APPA as applicable to minor judgment modifications. *United States v. American Cyanamid Co.*, 719 F.2d 558, 565 n.7; *United States v. General Motors Corp.*, 1983-2 Trade Cas. ¶ 65,614 at 69,093 (N.D. Ill. 1983). *But see United States v. Motor Vehicle Mfrs. Ass'n*, 1981-2 Trade Cas. ¶ 64,370 (C.D. Cal. 1981).

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July 2008, I caused a copy of the foregoing Memorandum in Support of Motion to Modify Final Judgment to be mailed, by U.S. mail, postage prepaid, to the attorney listed below:

*Suzanne Morris*

Suzanne Morris

For Amsted Industries, Inc.:

Peter J. Love, Esquire
Joe Sims, Esquire
Jones Day
51 Louisiana Avenue, NW
Washington, D.C. 20001

## DECLARATION OF BRIAN CUNKELMAN

I, Brian Cunkelman, declare under penalty of perjury:

1. I am the Vice President and General Manager of Wabtec Global Services. I submit this declaration in support of the United States' motion that the Court modify Section IV(D) of the Final Judgment in *United States v. Amsted Indus., Inc.*, No. 1:07-cv-00710 (Bates, J).

2. When Wabtec agreed to acquire the assets Amsted was required to divest as a result of the Department of Justice investigation into Amsted's acquisition of FM Industries, Inc. from Progress Rail, Wabtec initially hoped and expected that AAR would transfer the active certification for the FMI units to Wabtec. It requested the transfer by letter dated August 7, 2007 (approximately a week after signing the asset purchase agreement with Amsted).

3. AAR denied the request on August 23, 2007. A week later, at an AAR meeting, Wabtec asked for and received more information about AAR's concerns. Among these were unexpected concerns surrounding Wabtec's personnel and experience base, the lack of equipment to build the units, and the fact that Wabtec did not obtain certain equipment from FMI that AAR felt was an integral part of the EOCC production process.

4. Wabtec spent the next months working to address AAR's stated concerns, including hiring employees, obtaining assets, and completing the lengthy process of installing a production line and producing reconditioned product samples. On December 10, 2007, after addressing AAR's concerns, Wabtec requested a detailed list of AAR's remaining requirements for approval.

5.  Unfortunately, AAR did not respond for two months.  Wabtec finally received detailed instructions (with apologies for the delay) on February 7, 2008.

6.  Wabtec immediately set about meeting these requirements.  Wabtec requested scheduling of the required inspection, including a mechanical inspection and an M-1003 quality audit.  It completed its full production line at the Wabtec Global Service Center in Kansas City, MO on February 25 and proceeded with the inspections.  On March 25 Wabtec passed the mechanical inspection and on April 9 it passed the M-1003 inspection.

7.  What remains is to perform an impact test on the units at Wabtec's Cardwell test facility.  Due to the need to replace some testing equipment at the test facility in May, Wabtec has not been able to schedule that test.  Wabtec plans to schedule the impact test with AAR for July 31, 2008, subject to AAR observer availability.  Assuming the production passes the impact test, I estimate that AAR would issue conditional approval for certification of Wabtec's equipment approximately two weeks later.

Dated:  July 10th, 2008

Brian Cunkelman